Filed 10/4/16

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE


| | |
|---|---|
| MICHAEL MARKOW et al., | B260715, B262530 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. BC476993) |
| v. | |
| HOWARD L. ROSNER et al., | |
| Defendants and Appellants. | |


APPEAL from a judgment of the Superior Court of Los Angeles County, Elizabeth R. Feffer, Judge. Affirmed in part and reversed in part.

Cole Pedroza, Curtis A. Cole, Kenneth R. Pedroza, E. Todd Chayet; Moore McLennan, Raymond R. Moore and Arthur E. Zitsow for Defendant and Appellant Howard L. Rosner.

Horvitz & Levy, S. Thomas Todd, David Ettinger; Reback, McAndrews, Kjar, Warford, Stockalper & Moore and Robert C. Reback for Defendant and Appellant Cedars-Sinai Medical Center.

Goldstein, Gurbuz & Robertson, Arnold E. Goldstein and Joy Lynn Robertson for Plaintiff and Respondent Michael Markow.

Law Offices of Howard A. Kapp and Howard A. Kapp for Plaintiff and Respondent Francine Markow.

Plaintiffs Michael Markow (Markow) and his wife, Francine Markow, sued Markow's pain management physician, Howard L. Rosner, M.D., and Cedars-Sinai Medical Center (Cedars) for professional negligence and loss of consortium after Rosner's treatment rendered Markow quadriplegic. A jury found that both Rosner and Cedars had been negligent, but that only Rosner's negligence had been a substantial factor in causing Markow's severe injuries. The jury nonetheless apportioned 40 percent of fault to Cedars, apparently on the basis of its finding that Rosner was Cedars's ostensible agent. Both Rosner and Cedars appealed.

Cedars contends that, as a matter of law, Rosner could not be found to be its ostensible agent because in Conditions of Admissions forms Markow initialed and signed on 25 separate occasions Cedars unambiguously informed Markow that all physicians furnishing services to patients were independent contractors, not agents or employees of Cedars. We agree and reverse the judgment as to Cedars. Under the circumstances, Markow knew or should have known that Rosner was not Cedars's agent. Markow's belief to the contrary was not objectively reasonable, and Cedars's motion for judgment notwithstanding the verdict should have been granted.

Rosner contends that the evidence was insufficient to support the jury's finding he was negligent, the special verdict was hopelessly inconsistent and warranted a new trial, the award of future economic damages was excessive, and plaintiffs were not entitled to costs under Code of Civil Procedure section 998.[1] We find no merit in Rosner's claims and therefore affirm the judgment against him.

## BACKGROUND

### 1. Markow's decision to seek treatment from Rosner

Markow began to experience serious and chronic pain in 2003, following an automobile accident. By 2006, Markow suffered from "continuous" and "severe" pain in his neck, back, arm, and shoulder. To help Markow manage his pain, one of his doctors referred him to Rosner.

---

[1] Undesignated statutory references are to the Code of Civil Procedure.

2

Markow researched Rosner on the Internet before going to see him. Markow visited Cedars's Web page and was impressed to discover that Rosner was the medical director of the pain center at Cedars. The Web page stated that the center was the largest pain management program in the Western United States, with 14 to15 practitioners, "from psychologists through interventional pain physicians [and] two full-time committed procedure rooms." The center treats approximately 27,000 patients per year and performs approximately 600 procedures per month. Although Cedars was 30 to 40 miles from his home, Markow elected to become one of Rosner's patients. Markow testified he did so because Rosner was the medical director of a pain center at a major medical center that was also a teaching hospital. Markow explained that he went to Rosner because he "worked for the best hospital, one of the best hospitals in the country."

Markow's first appointment with Rosner was on May 15, 2006.

**2. The actual and apparent relationship between Cedars and Rosner**

Cedars's pain center was located down the street from the actual hospital in a building owned by Cedars. Cedars owns or supplies the pain center's equipment and consumables, and the nurses and other nonphysician staff members are employees of Cedars. In keeping with California's ban on the corporate practice of medicine (Bus. & Prof. Code, § 2400), Rosner was not an employee of Cedars, but was instead a partner in the General Anesthesia Specialists Partnership Medical Group (GASP). GASP billed patients, including Markow, for Rosner's professional services, and the evidence at trial demonstrated that Markow paid GASP for Rosner's services.

Nonetheless, Rosner did not usually give patients his GASP business cards, but instead gave them business cards imprinted with Cedars's name, without any reference to GASP. Cedars's Web site identified Rosner as the medical director of its pain center, also without reference to GASP. The Web page for the pain center further directed potential patients to phone "1-800-CEDARS-1" to make an appointment. However, Rosner's "Cedars" business card and his correspondence (to the extent reflected in the record) listed a different number in the 310 area code. In addition, with Cedars's authorization, Rosner used a Cedars logo in his letterhead when corresponding with

3

referring physicians.  There were no signs in the pain center offices informing patients that Rosner worked for GASP.

**3.      Cedars's disclosures regarding physicians' status as independent contractors**

Over the four-and-one-half-year period that Rosner treated Markow, Markow signed and initialed 25 Conditions of Admissions forms bearing Cedars's name and logo. In May 2006, when Markow began his treatment with Rosner, the Conditions of Admissions form (Oct. 2003 revision) was three pages long and single-spaced.  The second paragraph on the first page of this form was printed in boldface and in a larger pitch than any of the other paragraphs.  It stated as follows:

"**2.  Legal Relationship Between Hospital and Physicians**

"**In accordance with California law which prohibits the Corporate practice of Medicine, physicians are independent contractors and are neither employed by nor agents of this facility.  Patient recognizes that Physicians furnishing services to the Patient, including without limitation Emergency Room physicians, radiologists, pathologists and anesthesiologists, are all independent contractors with Patient for the purposes of the provision of professional services and are not employees or agents of Cedars-Sinai Medical Center for such purposes.  _____ (Initial here**)."

In the smaller pitch used in the rest of the document and without boldface, the disclaimer continued and stated:  "The physician groups include, but are not limited to: . . . General Anesthesia Specialists Partnership Medical Group."  The disclaimer paragraph was the only portion of the entire three-page document that a patient was asked to separately initial.

On July 15, 2006, the Conditions of Admissions form was amended.  The third paragraph on the first page of the amended form was printed in a larger pitch than any of the other paragraphs.  It stated as follows:

"**3.  PHYSICIANS ARE INDEPENDENT CONTRACTORS**

"All physicians and surgeons furnishing services to the Patient, such as radiologists, pathologists, anesthesiologists and the like, are independent contractors and

4

are **not** employees or agents of the Hospital.  These physicians may bill separately for their services."

Following this paragraph was either a boldfaced "**Patient initials:  _____**" or a large rectangle above the descriptor, "Patient initials:  _____."  Beneath the space for initialing, the disclaimer continued:  "The patient is under the care and supervision of his / her attending physician and it is the responsibility of the Hospital and its nursing staff to carry out the instructions of such physician.  It is the responsibility of the Patient's physician or surgeon to obtain the Patient's informed consent, when required, to medical or surgical treatment, special diagnostic or therapeutic procedures, or Hospital services rendered to the Patient under the general and special instructions of the physician."

Markow testified that when he was first presented with a Conditions of Admissions in May 2006, he read it and, for some time thereafter, he continued to read each subsequent Conditions of Admissions before signing and initialing.  Ultimately, however, he stopped reading them because "they all appeared to be the same."  Markow believed that the independent contractor disclaimer did not apply to Rosner because "he was director of pain management for the hospital" and, as a result, he "can't be an independent contractor."  Markow thought Rosner must be a "full-time employee" of Cedars.  Markow further testified that he believed, but was not certain, that his neurologist—who was also the director of a department at Cedars and also had an office in the same building as Rosner's—was an employee of Cedars.

In addition to the 25 Conditions of Admissions documents, Markow signed at least eight documents entitled, "Authorization for & Consent to Surgery or Special Diagnostic or Therapeutic Procedures or Blood Transfusions," prior to and on the date of the injurious procedure.  Each of these contained the following paragraph on the first page: "3.  I understand that the person or persons in attendance at such operation or procedures, as indicated above, for the purpose of administering anesthesia, and the person or persons performing other specialized professional services, such a radiology, pathology, and the like, are not the agents, servants or employees of Cedars-Sinai Medical Center, but are

5

independent contractors performing specialized services on my behalf and, as such, are the agents of myself."

## 4. Markow's injuries during treatment

On November 11, 2010, Rosner performed a nerve root block procedure on Markow. This procedure was similar to other procedures that Rosner had performed on Markow, but was much higher on the spine, at the base of the skull near the brain stem. Rosner conceded at trial that the procedure was both "very rare" and quite "risky."[2] Immediately after the procedure, Markow was in "tremendous pain, terrible pain," as if "a thousand tiny hot lancets" were penetrating his face. It was a pain that Markow had never experienced before. Markow continued to experience this lancing pain in his face on an intermittent basis over the course of the next week.

On November 19, 2010, eight days after the procedure, Markow began to develop neurological problems in his upper and lower extremities. On November 20, 2010, due to "substantial sensory deficit" on one side of his body and "weakness" on the other, Markow was rushed to Cedars's emergency room. Over the course of the next several weeks, Markow's condition deteriorated, eventually leaving him quadriplegic. Markow remained hospitalized for approximately the next two years.

In the weeks and months immediately following the paralysis, physicians at Cedars conducted a "very exhaust[ive] and thorough workup" to determine the cause of Markow's condition. The physicians believed that Markow's condition was "ultimately" due to a "cervical cord infarct," i.e., a stroke in the cervical spine, but they were unable to find evidence of any such stroke.

At the time of trial, Markow continued to suffer from the lancing facial pain, which is known as trigeminal neuralgia or trigeminal pain.

At trial, plaintiffs and their experts advanced two different causes for Markow's paralysis: Either Rosner used an iodine-based contrast (Omnipaque) to which Markow

---

[2] Rosner testified that of the approximately 1,500 nerve block procedures that he performs per year, only six are done at the C1–C2 levels in the cervical spine.

was allergic or Rosner caused mechanical trauma to Markow's cervical cord during the procedure.

With regard to their Omnipaque theory, plaintiffs presented evidence that although hospital records documented that Markow was allergic to iodine contrast and that Rosner had been aware of this allergy ever since he began treating Markow on May 15, 2006, Rosner, acting "in haste," filled out an "intra-procedure" order requesting Omnipaque for the November 11, 2010 procedure. Plaintiffs further established that no change in the contrast was ever documented for the November 11, 2010 procedure, that plaintiffs were billed by Cedars for Omnipaque, and that the billing form is completed by nurses during the procedure.

As for their mechanical trauma theory, plaintiffs established that immediately following the procedure, Rosner told Markow that the reason he was experiencing intense pain in his face was because Rosner "may have hit something he shouldn't have hit, touched something he shouldn't have touched . . . ." Plaintiffs' expert neurologist testified that the slow onset of Markow's quadriplegia was consistent with a vasospasm caused by a misplaced needle nicking the radicular artery that supplied the nerve root. The expert also testified that there was "objective evidence of trauma" because immediately following the procedure Markow suffered from trigeminal pain, and an MRI scan taken days after the procedure showed edema or swelling at the source of such pain, the trigeminal apparatus.

Rosner presented evidence that Markow's quadriplegia resulted from a cervical stroke induced by a purely coincidental blood clot, as shown by the slow deterioration that Markow suffered following the procedure. Plaintiffs' expert neurologist testified that the odds of such a stroke are one in 10,000.

7

### 5.      Litigation and trial

Plaintiffs sued defendants for professional negligence and loss of consortium.[3] The trial court denied Cedars's motion for summary judgment based upon lack of ostensible agency, finding that plaintiffs had submitted evidence from which "a jury could find . . . that Dr. Rosner is an agent of Cedars-Sinai."

Using a special verdict form, the jury found Rosner "negligent in the diagnosis or treatment" of Markow and that his negligence was a substantial factor in causing Markow's quadriplegia.  The jury also found that Cedars was negligent in its treatment of Markow, but found its negligence was not a substantial factor in causing harm to Markow.  The jury found Cedars vicariously liable for plaintiffs' damages because it "intentionally or carelessly" created the impression that Rosner was its agent and Markow was harmed as a result of his reasonable belief that Rosner was Cedars's agent. Although Rosner was the only defendant found to have caused Markow's injuries, the jury, in direct contradiction of the special verdict's instructions, allocated 60 percent of the fault to Rosner and 40 percent to Cedars.  After reducing damages for noneconomic losses to $250,000 pursuant to Civil Code section 3333.2, plaintiffs' damages award totaled $5.2 million.

### 6.      Posttrial motions

Cedars requested the trial court to strike the apportionment of fault, while Rosner moved for a new trial on grounds including the inconsistency of the jury's findings.  The trial court denied Rosner's motion and granted Cedars's.  It found that the jury erroneously answered the allocation question and struck the allocation of fault.

Cedars subsequently moved for judgment notwithstanding the verdict and for a new trial on several grounds, including that the verdict was contrary to law because the Conditions of Admissions conclusively established that Rosner was not Cedars's ostensible agent.  The trial court denied these motions.

---

[3] Plaintiffs also sued anesthesiologist Nirmala Thejomurthy, M.D., but the jury found that she was not negligent.

Rosner and Cedars timely appealed, and we consolidated their separate appeals.

## DISCUSSION

**1.      Cedars's liability on basis of ostensible agency**

**a.      Ostensible agency principles**

"An agency is ostensible when the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him." (Civ. Code, § 2300.)  "A principal is bound by acts of his agent, under a merely ostensible authority, to those persons only who have in good faith, and without want of ordinary care, incurred a liability or parted with value, upon the faith thereof." (Civ. Code, § 2334.)  "Before recovery can be had against the principal for the acts of an ostensible agent, three requirements must be met:  The person dealing with an agent must do so with a reasonable belief in the agent's authority, such belief must be generated by some act or neglect by the principal sought to be charged[,] and the person relying on the agent's apparent authority must not be negligent in holding that belief." (*J.L. v. Children's Institute, Inc.* (2009) 177 Cal.App.4th 388, 403–404.)

Where a patient seeks to hold a hospital liable for the negligence of a physician, the doctrine of ostensible agency is now commonly expressed as having two elements:  "(1) conduct by the hospital that would cause a reasonable person to believe that the physician was an agent of the hospital, and (2) reliance on that apparent agency relationship by the plaintiff." (*Mejia v. Community Hospital of San Bernardino* (2002) 99 Cal.App.4th 1448, 1453 (*Mejia*).)  Generally, the first is element is satisfied "when the hospital 'holds itself out' to the public as a provider of care," "unless it gave the patient contrary notice." (*Id.* at pp. 1453–1454.)  Nonetheless, a hospital's "contrary notice" may be insufficient "to avoid liability in an emergency room context, where an injured patient in need of immediate medical care cannot be expected to understand or act upon that information." (*Id.* at p. 1454.)  Reliance upon an apparent agency is demonstrated "when the plaintiff 'looks to' the hospital for services, rather than to an individual physician." (*Ibid.*)  Ultimately, "there is really only one relevant factual issue:  whether the patient had reason to know that the physician was not an agent of the hospital.  As

9

noted above, hospitals are generally deemed to have held themselves out as the provider of services unless they gave the patient contrary notice, and the patient is generally presumed to have looked to the hospital for care unless he or she was treated by his or her personal physician. Thus, unless the patient had some reason to know of the true relationship between the hospital and the physician—i.e., because the hospital gave the patient actual notice or because the patient was treated by his or her personal physician—ostensible agency is readily inferred." (*Id.* at pp. 1454–1455.)

Although the existence of an agency relationship is usually a question of fact, it "becomes a question of law when the facts can be viewed in only one way." (*Metropolitan Life Ins. Co. v. State Bd. of Equalization* (1982) 32 Cal.3d 649, 658.) In the physician-hospital-patient context, ostensible agency is a factual issue "[u]nless the evidence conclusively indicates that the patient should have known that the treating physician was not the hospital's agent, such as when the patient is treated by his or her personal physician" or received actual notice of the absence of any agency relationship. (*Mejia*, *supra*, 99 Cal.App.4th at pp. 1454, 1458.)

**b.      Because Markow received actual notice and was treated in a nonemergency context, there was no ostensible agency and Cedars was entitled to judgment as a matter of law.**

It was undisputed that on 25 occasions over the course of four and one-half years Markow received, read (until he realized that he recognized the language as the same used in forms he had previously read), signed, and initialed Conditions of Admissions forms that informed him that "**physicians are independent contractors and are neither employed by nor agents of this facility. Patient recognizes that Physicians furnishing services to the Patient, including without limitation . . . anesthesiologists, are all independent contractors with Patient for the purposes of the provision of professional services and are not employees or agents of Cedars-Sinai Medical Center for such purposes**" (Oct. 2003 Conditions of Admissions form); "physician groups include, but are not limited to: . . . General Anesthesia Specialists Partnership Medical Group" (July 15, 2006 Conditions of Admissions form); and "All physicians and

surgeons furnishing services to the Patient, such as radiologists, pathologists, anesthesiologists and the like, are independent contractors and are **<u>not</u>** employees or agents of the Hospital" (Conditions of Admissions form as amended in July 2006). Although the Conditions of Admissions forms also address a number of other topics, the disclaimer section stood out prominently on the first page of both versions of the form, in part because it was printed in a larger pitch than the other paragraphs in the form. Moreover, the disclaimer section was the only portion of either form requiring the patient to initial it. On the October 2003 Conditions of Admissions form, the disclaimer also stood out because it was in boldface print. On the July 2006 version of the Conditions of Admissions form in use for most of the period of 2007 through 2010, the disclaimer paragraph was even more prominent and distinctive because it was followed by a large rectangle in which the patient was to place his or her initials.

The wording of the disclaimer in each form, particularly in the version of the form in use from 2007 through 2010, was simple and unambiguous, not obtuse "legalese." Although plaintiffs and the dissent argue that the form failed to specify whether physicians who were also directors of practice areas such as the pain center were independent contractors, the language in each version of the form clearly included *all* physicians. The 2006 version initially stated, "**In accordance with California law which prohibits the Corporate practice of Medicine, physicians are independent contractors and are neither employed by nor agents of this facility.**" It then continued to specify, "**Patient recognizes that Physicians furnishing services to the Patient, including without limitation . . . anesthesiologists, are all independent contractors with Patient for the purposes of the provision of professional services and are not employees or agents of Cedars-Sinai Medical Center for such purposes.**" This language did not limit the category of independent contractor physicians to any subgroup, such as those who were not directors of practice areas, but expressly included *all physicians* furnishing services to patients, including anesthesiologists, which is Rosner's field of specialization. The form then went on to specify Rosner's practice group, GASP, as one of the "physician groups." Although Markow may not initially

11

have known that GASP was Rosner's practice group, he had reason to know this upon receiving a bill from GASP for Rosner's services. The Conditions of Admissions form as amended in July 2006 was also all-inclusive: "*All physicians* and surgeons *furnishing services to the Patient*, such as . . . anesthesiologists and the like, are independent contractors and are **not** employees or agents of the Hospital." (Italics added.) This language is simply not susceptible to an interpretation that would exclude Rosner, an anesthesiologist, because he was the director of the pain center.

In addition, Markow signed at least eight "Authorization for & Consent to Surgery or Special Diagnostic or Therapeutic Procedures or Blood Transfusions" forms prior to and on the date of the injurious procedure, and in each of these he again acknowledged that "persons in attendance at such operation or procedures as indicated above, for the purpose of administering anesthesia, and the person or persons performing other specialized professional services, such a radiology, pathology, and the like, are not the agents, servants or employees of Cedars-Sinai Medical Center, but are independent contractors performing specialized services on my behalf and, as such, are the agents of myself." When Rosner performed procedures on Markow to alleviate his pain, Rosner was a person in attendance for the purpose of performing specialized professional services. Thus, for every procedure, Markow signed at least one, and sometimes two forms acknowledging his receipt of actual notice that Rosner was an independent contractor, not an agent or employee of Cedars.

Furthermore, although Rosner's affiliation with Cedars, in conjunction with the allure of Cedars's reputation, played a significant role in Markow's decision to be treated by Rosner, it was undisputed that Markow chose Rosner to be his physician. Markow did not go to Cedars seeking care from its emergency room, as in many of the reported decisions upholding a finding of ostensible agency or concluding that ostensible agency was a factual issue for the jury. (See, e.g., *Whitlow v. Rideout Memorial Hospital* (2015) 237 Cal.App.4th 631 (*Whitlow*) [reversing summary judgment for hospital]; *Mejia*, *supra*, 99 Cal.App.4th 1448 [reversing judgment after nonsuit].) Nor was Rosner a physician on call who attended to Markow after he was admitted to the hospital, without Markow

12

having a choice or say in the matter. Instead, once treatment commenced and on the date of the injurious procedure, Rosner was one of Markow's *personal* physicians, i.e., Cedars did not *assign* Rosner to treat Markow; Markow *chose* Rosner. GASP billed Markow for Rosner's services and Markow paid for Rosner's services by paying GASP, not Cedars.[4] GASP was also specifically mentioned in the disclaimer section of the original Conditions of Admissions form prior to amendment in July 2006.

Accordingly, Markow indisputably either knew or should have known, based upon the Conditions of Admissions forms that he initialed and signed on multiple occasions, the "Authorization for & Consent to Surgery or Special Diagnostic or Therapeutic Procedures or Blood Transfusions" forms that he also signed on at least eight occasions, and Rosner's status as Markow's personal physician, that Rosner was not Cedars's agent or employee, but was instead an independent contractor.[5] Because the evidence conclusively indicates that Markow knew or at least should have known that Rosner was not Cedars's agent, this is an issue of law, not fact. (*Mejia*, *supra*, 99 Cal.App.4th at pp. 1454, 1458.)

Plaintiffs cite a variety of factors to support their ostensible agency theory, such as the contents of Cedars's Web site identifying Rosner as the director of its pain clinic and inviting would-be patients to phone 1-800-CEDARS-1; the location of the pain clinic in a building owned by Cedars and displaying Cedars's name and logo; Rosner's use, with Cedars's authorization, of Cedars's name and logo on his business cards and

---

[4] The record reflects Markow's payment of GASP's bills prior to the date of the injurious procedure. Billing by and payment of GASP was consistent with the contents of the disclaimer, i.e., Rosner was an independent contractor with respect to Cedars. In contrast, there was no evidence that Cedars billed Markow for Rosner's services.

[5] We do not intend to suggest that a patient must be advised of physicians' independent contractor status more than once to receive adequate notice. Nonetheless, in this case Markow received and acknowledged receipt of 25 such advisements that consistently informed him that physicians were independent contractors.

13

correspondence with physicians;[6] Cedars's ownership of the pain clinic's equipment and supplies and employment of nurses and other pain clinic staff;[7] Rosner's Cedars badge; and that Cedars recruited Rosner from the East Coast to be the director of the pain clinic. Assuming, for the sake of argument, that Markow had knowledge of and relied upon each of these factors, they are nonetheless negated by the actual notice Cedars provided Markow that Rosner was an independent contractor, not Cedars's agent or employee and Markow's express acknowledgement of receipt of such notice on the multiple Conditions of Admissions forms, not to mention the "Authorization for & Consent to Surgery or Special Diagnostic or Therapeutic Procedures or Blood Transfusions" forms and Rosner's status as Markow's personal physician.

Plaintiffs rely upon a number of distinguishable cases. In most of these cases, the defendant did not give the plaintiff notice of the lack of agency or employment. (*Stanhope v. L. A. Coll. of Chiropractic* (1942) 54 Cal.App.2d 141; *Ermoian v. Desert Hospital* (2007) 152 Cal.App.4th 475; *Quintal v. Laurel Grove Hospital* (1964) 62 Cal.2d 154; *Jacoves v. United Merchandising Corp*. (1992) 9 Cal.App.4th 88 (*Jacoves*).) Others (*Stanhope*, *supra*, 54 Cal.App.2d 141; *Whitlow*, *supra*, 237 Cal.App.4th 631) involve patients seeking care in an emergency room context where, as noted in *Mejia*, *supra*, 99 Cal.App.4th at page 1454, "an injured patient in need of immediate medical care cannot be expected to understand or act upon that information." In *Mejia* itself, the injured patient sought treatment in an emergency room and the hospital did not provide her any notice that the physicians were not its agents or employees. The appellate court concluded that "absent evidence that plaintiff should have known that the [allegedly negligent physician] was not an agent of respondent hospital, plaintiff has alleged

---

[6] We note, however, that nothing indicated Markow saw Rosner's correspondence with other physicians, which would be necessary to show reliance. Moreover, Markow did not testify that he relied upon the business cards or correspondence.

[7] Nothing indicated Markow knew who owned the equipment or provided the supplies.

14

sufficient evidence to get to the jury merely by claiming that she sought treatment at the hospital." (*Id.* at p. 1460.)

Although notice that physicians were independent contractors was given in *Whitlow*, *supra*, 237 Cal.App.4th 631, both in a Conditions of Admissions form and on a sign on the wall of the emergency room registration area, the patient was suffering excruciating pain from a brain hemorrhage and was unable to read the Conditions of Admissions form. Moreover, no one read it to her. (*Id.* at pp. 633–634.) Under those circumstances, the appellate court rejected "the notion that a signature on an admissions form conclusively constitutes notice to a patient *seeking care in an emergency room* that the treating physician, *whom she did not choose* and did not know, is not an agent of the hospital." (*Id.* at p. 641, italics added.)

Finally, in *Kaplan v. Coldwell Banker Residential Affiliates, Inc*. (1997) 59 Cal.App.4th 741, an experienced real estate investor who was also a superior court judge sued Coldwell Banker, as well as his broker (a Coldwell Banker franchisee) and others when he discovered misrepresentations regarding a property he had purchased. (*Id.* at p. 744.) Coldwell Banker required every franchisee to hold himself or herself out to the public as " 'independently owned and operated member[s] of Coldwell Banker Residential Affiliates, Inc.' " (*Ibid.*) The broker in question had printed this disclaimer language on his advertising, but in much smaller print than the name "Coldwell Banker." (*Ibid.*) This appears to have been in accordance with the requirements of the Coldwell Banker Identity Manual, a page from which was attached as an appendix to the appellate opinion. This page depicted sample "Exterior Signage" with "Coldwell Banker" in very large letters, the name of the franchisee in somewhat smaller letters, and the independent contractor disclaimer in very tiny letters at the bottom. (*Id.* at pp. 744, fn. 1, 749.) The plaintiff "testified that he 'went for the sign,' [and] did not notice the disclaimer language." (*Id.* at p. 744.) Here, however, the disclaimer was not hidden in fine print amidst other, more prominent language. It was in larger print and either in boldface print or right above a large rectangle in which the patient was to place his or her initials. It was also the only portion of the Conditions of Admissions form that required the patient to

15

initial it.  Unlike Kaplan, who did not see the fine-print disclaimer, Markow saw Cedars's disclaimer, read it a number of times, and initialed it each time he was presented with a Conditions of Admissions form.

The dissent relies upon a federal trial court case,[8] *Romar v. Fresno Community Hosp. and Medical Center* (E.D.Cal. Mar. 23, 2007, Civ. F. No. 03-6668 AWI SMS) 2007 WL 911882, in support of its position that the Conditions of Admissions forms were ambiguous regarding whether physicians who were directors of practice areas or administrative units were also independent contractors.  (Dis. & conc. opn. at pp. 6–7, *post*.)  However, the only potentially negligent personnel in *Romar* were physician assistants and nurse practitioners.  The "Conditions Form" stated that "[a]ll physicians and surgeons" were independent contractors, but was silent regarding physician assistants and nurse practitioners.  (*Romar*, at p. *2.)  Neither a physician's assistant nor a nurse practitioner falls within the scope of "[a]ll physicians and surgeons" because neither is a physician, let alone a surgeon.  However, a physician who is the director of a practice area or administrative unit clearly falls within the scope of the phrases used in the Conditions of Admissions forms presented to Markow, i.e., "physicians," "Physicians providing services," and "all physicians and surgeons furnishing services to the Patient."

In a related argument, the dissent also relies upon *Jacoves*, *supra*, 9 Cal.App.4th 88, for the proposition that "dual status physicians" such as Markow may be agents of the hospital.  (Dis. & conc. opn. at pp. 5–6, *post*.)  However, unlike this case, the hospital in *Jacoves* did not provide the plaintiff with any notice that the physicians were independent contractors, not agents or employees.  Here, in contrast, any inference of agency or employment arising from Rosner's status as director of the pain clinic was negated by the unambiguous and prominent disclaimer Markow repeatedly initialed.

The dissent also cites a second federal trial court case, *Van Horn v. Hornbeak* (E.D.Cal. Feb. 18, 2010, Civ. F. No. 08-1622 LJO DLB) 2010 WL 599885, in support of

---

[8] While such cases are citable, they do not constitute binding authority.  (*Gong v. City of Rosemead* (2014) 226 Cal.App.4th 363, 375.)

16

its view that the Conditions of Admissions forms did not provide Markow with notice as a matter of law. (Dis. & conc. opn. at p. 10, *post*.) Van Horn, a pregnant state prison inmate, was taken to a hospital four times: The first three visits were to the emergency room and on the fourth visit she was in labor. On each occasion she signed a Conditions of Admission form stating that all physicians and surgeons furnishing services to patients were independent contractors. (*Van Horn*, at p. *2.) The trial court denied the hospital's summary judgment motion, stating: "[P]laintiff made a sufficient showing on the question of ostensible agency to avoid summary judgment. Plaintiff declared that she had no reason to believe that [the physicians] were not hospital employees, that she believed they were, 'and was never told otherwise.' She was shackled, in pain, and 'forced' to sign the forms." (*Id.* at p. *10.) *Van Horn* thus represents an aggravated form of an emergency room case. Not only was the plaintiff seeking care in an emergency room on her first three visits, she was literally a prisoner in shackles. She had no choice in where to seek treatment, but was instead at the mercy of prison authorities and was "forced" to sign the form or, presumably, forgo medical care. Markow, however, was not a prisoner and chose Rosner to treat him. If Markow found Rosner's independent contractor status unacceptable, he was free to leave and seek treatment elsewhere—a course of action not available to inmate Van Horn.

None of the cases relied upon by the plaintiffs and the dissent addressed treatment of a patient by his own physician in a nonemergency context where the patient repeatedly read and initialed a prominent notice that his physician was an independent contractor, not an agent or employee of the hospital. Accordingly, none of these cases supports the proposition that ostensible agency remains a factual issue where the patient knew or should have known that his physician was not the hospital's agent. We conclude the jury's ostensible agency finding is contrary to law.

A trial court may grant a motion for judgment notwithstanding the verdict only if the evidence, viewed most favorably to the prevailing party, is insufficient to support the verdict. (*Cadam v. Somerset Gardens Townhouse HOA* (2011) 200 Cal.App.4th 383, 388.) Generally, an appellate court reviews a trial court's ruling on such a motion for

sufficiency of the evidence supporting the verdict. (*Ibid.*) However, review is de novo "[i]f the appeal challenging the denial of the motion for judgment notwithstanding the verdict raises purely legal questions." (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1138.) Here, all of the facts essential to the issue of ostensible agency were undisputed. The only issue was whether Markow's purported conclusion that Rosner was Cedars's agent was reasonable, which is a question of law. (*Mejia*, *supra*, 99 Cal.App.4th at pp. 1454, 1458.) Accordingly, after de novo review, we conclude that the jury's finding of ostensible agency was contrary to the law, and the trial court should have granted Cedars's motion for judgment notwithstanding the verdict. We therefore reverse the judgment as to Cedars.

## 2.     Sufficiency of the evidence

Rosner contends the verdict was not supported by substantial evidence.

### a.     Standard of review

In reviewing the sufficiency of evidence to support the jury's finding, we review the record in the light most favorable to the prevailing party, resolving in favor of the prevailing party all conflicts in either the evidence or the reasonable inferences to be drawn therefrom, to determine whether the record contains substantial evidence, contradicted or uncontradicted, supporting the finding. (*State Farm Fire & Casualty Co. v. Jioras* (1994) 24 Cal.App.4th 1619, 1625–1626; *Hasson v. Ford Motor Co.* (1977) 19 Cal.3d 530, 544, overruled on another ground in *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580.) " 'Substantial evidence' is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value." (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.) "The focus is on the quality, rather than the quantity, of the evidence." (*Ibid.*) "Inferences may constitute substantial evidence, but they must be the product of logic and reason. Speculation or conjecture alone is not substantial evidence." (*Ibid.*) "The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record." (*Id.* at p. 652.) The testimony of a single witness may be sufficient. (*Dart Industries, Inc. v. Commercial Union Ins. Co.* (2002) 28 Cal.4th 1059, 1075.)

18

**b.** **The jury's negligence finding was supported by substantial evidence.**

Plaintiffs presented undisputed evidence that Rosner erred by ordering an iodine-containing contrast, Omnipaque, for the November 11, 2010 procedure. In addition, plaintiffs presented evidence which strongly suggested that this initial error was not corrected. There was no documentation showing that an iodine-free contrast was substituted for the Omnipaque before the procedure. Moreover, there was undisputed evidence that plaintiffs were billed for Omnipaque and only Omnipaque—that is, plaintiffs were not inadvertently billed for two contrasts, one containing iodine and one iodine-free contrast. In addition, plaintiffs' pain management expert testified that delayed hypersensitivity reactions to iodine agents, such as Omnipaque, are quite common and typically occur 6 to ten days later. Such a delay in this case would be consistent with the nine-day interval between November 11, 2010, the day of the procedure, and November 20, 2010, the day when Markow was rushed back to Cedars.

With respect to the alternate theory that Markow was injured by means of negligent mechanical trauma, it was undisputed that Markow suffered from trigeminal nerve pain immediately upon awakening from the procedure. It was further undisputed that such pain was unprecedented for Markow. Although he had received many similar treatments lower on his cervical spine, he had never previously experienced thousands of "hot lancets" in his face. In addition, an MRI scan taken upon Markow's return to Cedars on November 20, 2010, revealed that there was swelling at the trigeminal apparatus. Plaintiffs' expert neurologist testified that the swelling was "objective evidence of trauma," and that the chances of Markow suffering a purely coincidental stroke in his cervical spine at or around the same time he underwent the November 11, 2010 procedure were one in 10,000.

Rosner contends that the jury's verdict was not supported by substantial evidence because plaintiffs' experts could not definitively state whether an allergic reaction to the iodine contrast or mechanical trauma caused Markow's paralysis and conceded that a coincidental stroke was a possibility. Plaintiffs and their experts, however, were not required to rule out all causes but one. "Under the applicable substantial factor test, it is

19

not necessary for a plaintiff to establish the negligence of the defendant as the proximate cause of injury with absolute certainty *so as to exclude every other possible cause of a plaintiff's illness*." (*Cooper v. Takeda Pharmaceuticals America, Inc*. (2015) 239 Cal.App.4th 555, 578.)  Instead, plaintiffs were only required to " 'offer an expert opinion that contains a reasoned explanation illuminating why the facts have convinced the expert, and therefore should convince the jury, that it is *more probable than not* the negligent act was a cause-in-fact of the plaintiff's injury.' " (*Ibid.*)  Plaintiffs met this burden.  Their experts offered reasoned explanations for how Rosner's negligence caused Markow's quadriplegia:  Either Rosner used Omnipaque or he inflicted some form of mechanical trauma on Markow during the November 11, 2010 procedure.

In short, we find that the jury's verdict was supported by evidence that was reasonable, credible, and of solid value.

**3.      Failure to require findings on plaintiffs' alternate theories of negligence**

Rosner also contends the special verdict form should have included questions that would have addressed plaintiffs' different negligence theories.

"[A] special verdict is that by which the jury find the facts only, leaving the judgment to the court.  The special verdict must present the conclusions of fact as established by the evidence, and not the evidence to prove them; and those conclusions of fact must be so presented as that nothing shall remain to the court but to draw from them conclusions of law." (§ 624.)  " 'Unlike a general verdict (which merely *implies* findings on all issues in favor of the plaintiff or defendant), a special verdict presents to the jury each ultimate fact in the case.  The jury must resolve all of the ultimate facts presented to it in the special verdict, so that "nothing shall remain to the court but to draw from them conclusions of law." ' " (*Myers Building Industries, Ltd. v. Interface Technology, Inc*. (1993) 13 Cal.App.4th 949, 959–960.)

The special verdict form used in this case properly required the jury to make findings only as to ultimate facts for plaintiffs' sole cause of action.  Including questions that separately addressed each of plaintiffs' theories of negligence would have required the jury to decide evidentiary facts, in contravention of section 624.

Rosner's reliance on *Valentine v. Baxter Healthcare Corp.* (1999) 68 Cal.App.4th 1467 is misplaced. In *Valentine*, the Court of Appeal held that it was proper to pinpoint the plaintiffs' distinct negligence theories even though there was only a single cause of action, but it did so only because of exceptional circumstances—there had already been two trials and two verdicts: "This was a case calling for special verdicts that would pinpoint the jury's fact finding and enable judgment to be entered rather than prolonging litigation with a possible third trial." (*Id.* at p. 1488.)

## 4. Inconsistent findings in special verdict

Rosner contends he was entitled to a new trial because the special verdict was hopelessly ambiguous, in that the jury concluded both that Cedars's negligence was not a cause of Markow's injuries and that it was a cause of 40 percent of his injuries. Rosner argues the trial court erred by choosing one of these findings over the other.

### a. Standard of review

"A special verdict is inconsistent if there is no possibility of reconciling its findings with each other. [Citation.] If a verdict appears inconsistent, a party adversely affected should request clarification, and the court should send the jury out again to resolve the inconsistency. [Citations.] If no party requests clarification or an inconsistency remains after the jury returns, the trial court must interpret the verdict in light of the jury instructions and the evidence and attempt to resolve any inconsistency." (*Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 357–358, fn. omitted.) "On appeal, we review a special verdict de novo to determine whether its findings are inconsistent. [Citation.] With a special verdict, . . . a reviewing court will not infer findings to support the verdict. [Citations.] ' " 'Where the findings are contradictory on material issues, and the correct determination of such issues is necessary to sustain the judgment, the inconsistency is reversible error.' " ' " (*Ibid.*)

### b. The special verdict was not hopelessly ambiguous.

The trial judge instructed the jury: "I will give you a verdict form with questions you must answer. I've already instructed you on the law that you are to use in answering these questions. You must follow my instructions and the form carefully. You must

21

consider each question separately. [¶] Although you may discuss the evidence and the issues to be decided in any order, you must answer the questions on the verdict form in the order they appear. After you answer a question, the form tells [you what] to do next."

Question 6 on the verdict form asked: "Was Howard Rosner, M.D.'s negligence a substantial factor in causing harm to Michael Markow?" The jury answered yes. Question 8 on the verdict form asked: "Was Nirmala Thejomurthy, M.D.'s negligence a substantial factor in causing harm to Michael Markow?" The jury did not answer this question, having found that Dr. Thejomurthy was not negligent in the first place. Question 10 on the verdict form asked: "Was Cedars-Sinai Medical Center's negligence a substantial factor in causing harm to Michael Markow?" The jury answered no.

Question 16 on the verdict form was preceded by the following direction: "If the jury found more than one defendant liable for Plaintiffs' injuries, i.e. the jury previously answered yes to more than one of these questions: 6, 8, and 10, answer the following, for each defendant(s) that the jury found to be negligent. [¶] The names of all three defendants are provided in this question. If you did not find that a particular defendant was liable for Plaintiffs' injuries (i.e. the particular defendant was not negligent and/or the defendant's negligence was not a substantial factor in causing harm), then please do not assign a percentage of fault to that defendant." Although the jury had not "previously answered yes to more than one of these questions: 6, 8, and 10," the jury answered question 16, apportioning fault 60 percent to Rosner and 40 percent to Cedars.

Question 16 was included on the special verdict form because Civil Code section 1431.2, subdivision (a), enacted in 1986 as part of Proposition 51, provides as follows: "In any action for personal injury, property damage, or wrongful death, based upon principles of *comparative fault*, the liability of each defendant for non-economic damages shall be several only and shall not be joint. Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault . . . ." (Italics added.) However, such an allocation does not apply to defendants whose liability is vicarious. (*Diaz v. Carcamo* (2011) 51 Cal.4th 1148, 1156–1157.)

22

Cedars's liability (as found by the jury) was based on ostensible agency, not comparative fault. The jury's allocation of any percentage of fault to Cedars was therefore improper, as well as contrary to the court's directions on the special verdict form. This does not mean, however, that the verdict was hopelessly ambiguous and a new trial was required. A similar claim was made and rejected on very similar facts in *Miller v. Stouffer* (1992) 9 Cal.App.4th 70, in which a jury acted on its own initiative to allocate fault between the driver of a vehicle that struck a pedestrian and the driver's employer, who also owned the car. The jury had found that the driver acted negligently and was acting within the course and scope of her employment when she struck the plaintiff. (*Id.* at pp. 75–76.) On appeal the employer contended that the verdict was " 'hopelessly ambiguous' " because even though "there was no claim of fault or direct liability against" her, "the jury allocated 40 percent of the negligence to her and also found her vicariously liable for the accident." (*Id.* at p. 86.) The court rejected her contention, explaining that because the trial court granted the plaintiff's "motion for JNOV and allocated 100 percent of the liability for negligence to [the employee], making [the employer's] liability purely vicarious," there was no ambiguity warranting retrial. (*Ibid.*) Here, too, the trial court eliminated the ambiguity by giving effect to the jury's ostensible agency finding and striking the jury's improper allocation of fault.

Rosner principally relies on *Scott v. C. R. Bard, Inc.* (2014) 231 Cal.App.4th 763 and *Mendoza v. Club Car, Inc.* (2000) 81 Cal.App.4th 287, both of which addressed a comparative fault allocation among directly liable tortfeasors. These cases are therefore inapposite to a jury's improper attempt to allocate fault between a directly liable defendant and a vicariously liable defendant.

Accordingly, we hold that the trial court was not required to grant a new trial, but instead acted properly to eliminate the ambiguity or inconsistency by striking the jury's apportionment of fault.

5.     **Excessiveness of future economic damages**

The jury awarded Markow $4.5 million for future economic loss, which included $1.3 million for the cost of future hospitalizations. Rosner contends he is entitled to a

23

new trial on plaintiffs' future economic damages because the jury's award for future hospitalizations is excessive, in that "plaintiffs' expert did not consider amounts actually paid for hospitalization."

###### a.      Standard of review

" 'Whether a plaintiff "is entitled to a particular measure of damages is a question of law subject to de novo review.  [Citations.]  The amount of damages, on the other hand, is a fact question . . . [and] an award of damages will not be disturbed if it is supported by substantial evidence." ' "  (*Bermudez v. Ciolek* (2015) 237 Cal.App.4th 1311, 1324 (*Bermudez*).)

###### b.      Substantial evidence supported the award for the cost of future hospitalizations.

The jury in this case was properly instructed with CACI No. 3903A, which directs the jury to determine "the reasonable cost of reasonably necessary medical care that [Markow] is reasonably certain to need in the future."  (See Civ. Code, §§ 3283 [damages may be awarded for "detriment . . . certain to result in the future"], 3359 ["[d]amages must, in all cases, be reasonable"]; *Corenbaum v. Lampkin* (2013) 215 Cal.App.4th 1308, 1330.)

Our Supreme Court has endorsed a market or exchange value as the proper way to think about the reasonable value of medical services.  (*Howell v. Hamilton Meats & Provisions, Inc.* (2011) 52 Cal.4th 541, 556.)  This applies to the calculation of future medical expenses.  (*Corenbaum v. Lampkin*, *supra*, 215 Cal.App.4th at pp. 1330–1331.)  For insured plaintiffs, the reasonable market or exchange value of medical services will not be the amount *billed* by a medical provider or hospital, but the "amount *paid* pursuant to the reduced rate negotiated by the plaintiff's insurance company."  (*Bermudez*, *supra*, 237 Cal.App.4th at p. 1332, italics added.)

Plaintiffs' life care planning expert,[9] Tricia West, R.N., estimated that the amount billed for Markow's future hospitalizations would be approximately $2 million. Based on her research, knowledge, and experience, West testified that the amount actually paid is usually 50 to 75 percent of the total amount billed.[10] West also testified that with respect to one particular hospitalization, the cost was reimbursed at a much lower rate of 12.9 percent. The jury's award of $1.3 million is approximately 65 percent of the estimated future billing amount of $2 million, or roughly halfway between the 50 to 75 percent reimbursement testified to by West.

In his motion for a new trial and on appeal, Rosner argues that the jury's award of $1.3 million is excessive, that the jury should have applied the 12.9 percent reimbursement rate from that one hospital stay, not the 50 to 75 percent offered by West. If the jury had utilized the 12.9 percent rate, the award for future hospitalizations would have been reduced to $260,000.

Substantial evidence supports the jury's award. While West acknowledged that in one instance a hospital accepted a reimbursement rate much lower than 50 to 75 percent, she also testified that reimbursement rates vary and that there is no one "across-the-board, set percentage." West testified that she has been doing life care planning for almost seven years. In addition to her experience as a life care planner, she has a bachelor's degree in critical care nursing, and a master's degree in business administration with a specialty in healthcare management; she is also a certified hemodialysis nurse and is licensed as both an R.N. and a public health nurse. The jury could reasonably find

---

[9] Plaintiffs also had two other damages experts testify at trial: an economist and a physical therapy/rehabilitation expert. Defendants offered no expert testimony on plaintiffs' damages.

[10] Between September 2011 and March 2014, Markow spent 245 days in the hospital, averaging 98 days per year. West estimated that due to professional in-home nursing care, Markow would average far fewer days in the hospital than before, only 28 days per year.

West's testimony on the reimbursement rate to be credible. Accordingly, we find that substantial evidence supports the jury's award of future economic damages.[11]

## 6. Section 998 costs

More than six months before trial, plaintiffs jointly served Rosner with a single offer to compromise their claims for $999,999.99 pursuant to section 998. The offer did not allocate the settlement funds between Markow and his wife. Moreover, the offer was conditioned on the accuracy of Rosner's representation that he had only $1 million in insurance coverage for plaintiffs' claims. Because Rosner rejected this offer and plaintiffs were awarded more than $1 million, they sought to recover section 998 costs from Rosner. Rosner moved to strike plaintiffs' costs claim on the ground the settlement offer was invalid because it was joint and conditional. The trial court denied the motion. Rosner contends that the trial court erred by denying his motion.

### a. Standard of review

The interpretation and applicability of a statute is a question of law, which we review de novo. (*Barella v. Exchange Bank* (2000) 84 Cal.App.4th 793, 797 (*Barella*).) "In interpreting section 998, this court has placed squarely on the offering party the burden of demonstrating that the offer is a valid one under section 998." (*Barella*, at p. 799.)

### b. Plaintiffs' joint section 998 offer to Rosner was valid.

Rosner's argument that plaintiffs' joint section 998 offer is invalid is based on the language of section 998, subdivision (d): "If an offer made by *a plaintiff* is not accepted . . . ." (Italics added.)

_____

[11] Citing *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 753, Rosner also contends that West's testimony was speculative. To the extent that Rosner's argument on future hospital costs challenges the bases for West's opinions, we hold that he waived this contention by, inter alia, not filing a motion in limine seeking to exclude West's testimony. "We leave the question of how courts should fulfill their gatekeeper role in a case like the instant one for an appeal in which the parties have *actually litigated the issue at trial*." (*Bermudez, supra*, 237 Cal.App.4th at p. 1340, italics added.)

26

"The first rule of statutory construction is, of course, that a statute should be construed to effectuate the intention of the Legislature in enacting it." (*Fortman v. Hemco, Inc.* (1989) 211 Cal.App.3d 241, 262 (*Fortman*).) "As recognized in numerous Court of Appeal decisions, the clear purpose of section 998 and its predecessor, former section 997, is to encourage the settlement of lawsuits prior to trial." (*T. M. Cobb Co. v. Superior Court* (1984) 36 Cal.3d 273, 280.) "The purpose of section 998 is to encourage the settlement of lawsuits before trial by penalizing a party who fails to accept a reasonable offer from the other party." (*Taing v. Johnson Scaffolding Co.* (1992) 9 Cal.App.4th 579, 583.)

Joint settlement offers are not necessarily invalid. (*Fortman*, *supra*, 211 Cal.App.3d at p. 263.) "An offer of settlement must be certain, and when an offer is made jointly, the offeree must be able to evaluate the likelihood of each offeror receiving a more favorable verdict at trial." (*Persson v. Smart Inventions, Inc.* (2005) 125 Cal.App.4th 1141, 1170.) *Deocampo v. Ahn* (2002) 101 Cal.App.4th 758 (*Deocampo*) upheld the validity of a joint offer to compromise made by two plaintiffs: a man rendered a paraplegic by the defendant's medical malpractice and his wife (asserting a loss of consortium claim). The court stated: "[P]laintiff's wife could only have recovered a maximum of $250,000 on her cause of action. Thus, the bulk of plaintiffs' section 998 offer was obviously meant for plaintiff himself. Moreover, the trial court could not have been confused about whether plaintiff obtained a more favorable judgment than that for which he offered to settle. Since the jury did not award plaintiff's wife any damages, it is clear that the damages the jury *did* award are far greater than the amount requested in the section 998 offer, less the maximum $250,000 that plaintiff's wife could have recovered." (*Id.* at p. 777.)

Similarly, joint section 998 offers by multiple plaintiffs were held to be valid in *Johnson v. Pratt & Whitney Canada, Inc.* (1994) 28 Cal.App.4th 613, 630; *Stallman v. Bell* (1991) 235 Cal.App.3d 740, 747; and *Fortman*, *supra*, 211 Cal.App.3d at page 263.

The joint offer in this case did not preclude a determination of whether plaintiffs received a more favorable judgment. Plaintiffs offered to settle the case for just under

27

$1 million, yet the jury awarded them $5.2 million. Thus, it is clear that plaintiffs were awarded far more than they would have received from their joint settlement offer. Moreover, as held in *Atkins v. Strayhorn* (1990) 223 Cal.App.3d 1380, 1394, and noted in *Deocampo*, *supra*, 101 Cal.App.4th at page 777, the spouse could recover a maximum of $250,000 on her loss of consortium claim pursuant to Civil Code section 3333.2. This statutory limit provided a further guideline for assessing the certainty and validity of plaintiffs' offer to compromise. Accordingly, we hold that their section 998 offer was not invalid because it was jointly made.

      **c.      Plaintiffs' conditional section 998 offer to Rosner was valid.**

Rosner also argues that the section 998 offer was invalid because it was conditioned on the accuracy of Rosner's disclosures regarding his insurance coverage for plaintiffs' claims.

"An offer to compromise under Code of Civil Procedure section 998 must be sufficiently specific to allow the recipient to evaluate the worth of the offer and make a reasoned decision whether to accept the offer. [Citations.] Any nonmonetary terms or conditions must be sufficiently certain and capable of valuation to allow the court to determine whether the judgment is more favorable than the offer." (*Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720, 764 (*Fassberg*).)

As Rosner acknowledges, *Deocampo*, *supra*, 101 Cal.App.4th 758, upheld the validity of a settlement offer conditioned on the accuracy of the offeree's discovery responses regarding the amount of insurance coverage for the plaintiffs' claims. The *Deocampo* court explained: "The provision simply sought to hold [the doctor] to his discovery representation that he only had $1 million in insurance coverage for plaintiffs' claims. Certainly litigants have a right to condition an offer to compromise on the accuracy of the information supplied by the offeree in discovery." (*Id.* at p. 778.) We agree. Plaintiffs' section 998 offer was not invalid merely because it was conditioned on the accuracy of Rosner's disclosures regarding his insurance coverage for plaintiffs'

claims.  This nonmonetary condition was sufficiently certain and capable of valuation to allow the court to accurately assess the offer.

The cases Rosner relies upon are distinguishable in that none of them involved an offer to compromise conditioned on the accuracy of the offeree's discovery responses. (See *Menees v. Andrews* (2004) 122 Cal.App.4th 1540, 1543–1546 [defense offer conditioned on acceptance by all plaintiffs invalid]; *Fassberg*, *supra*, 152 Cal.App.4th at pp. 765–767 [offer conditioned on releases by, and releases of claims against " 'a long list of other possible, ill-defined third parties' " not overbroad or incapable of valuation absent indication such parties possessed valid claim]; *Barella*, *supra*, 84 Cal.App.4th at p. 801 [offer conditioned on confidentiality invalid in defamation action].)

Accordingly, the trial court properly awarded plaintiffs section 998 costs.

## DISPOSITION

The judgment is affirmed with respect to Rosner and reversed with respect to Cedars-Sinai.  Plaintiffs are awarded costs with respect to Rosner's appeal.  Cedars-Sinai is awarded costs with respect to its appeal.

CERTIFIED FOR PUBLICATION.


LUI,  J.


I concur:


ROTHSCHILD, P. J.

JOHNSON, J., Dissenting and Concurring.

With regard to the ostensible agency issue, I respectfully dissent. As to all other issues, I join the majority.

The majority's discussion of the ostensible agency issue is remarkable less for what it says, than for how it cobbles together its justification for the remarkable conclusion it reaches.

### 1. *THE MAJORITY MISSTATES THE APPLICABLE STANDARD OF REVIEW*

In the very last paragraph of its discussion of the ostensible agency issue, the majority comes finally to the applicable standard of review, treating this critical issue almost as a given. (Maj. opn. *ante*, at pp. 17–18.) But the applicable standard of review is not a given, but "the threshold issue" for every appeal. (*Clothesrigger, Inc. v. GTE Corp.* (1987) 191 Cal.App.3d 605, 611.) The standard of review "is the compass that guides the appellate court to its decision. It defines and limits the course the court follows in arriving at its destination. Deviations from the path, whether it be one most or least traveled, leave writer and reader lost in the wilderness." (*People v. Jackson* (2005) 128 Cal.App.4th 1009, 1018.) In choosing an incorrect standard of review, the majority has strayed beyond the bounds of its authority and arrived at a necessarily flawed conclusion.

### a. *De novo is not the correct standard*

According to the majority, de novo review is required because "all of the facts essential to the issue of ostensible agency were undisputed" and, as a result, the appeal by Cedars-Sinai Medical Center (Cedars) "'raises purely legal questions.'" (Maj. opn. *ante*, at p. 18.) The majority bases its conclusion on *Mejia v. Community Hospital of San Bernardino* (2002) 99 Cal.App.4th 1448 (*Mejia*). I believe that the majority is mistaken and its reliance on *Mejia* misplaced.

It is not correct that all of the facts essential to a determination of the ostensible agency issue were undisputed. While it was undisputed, for example, that Michael Markow (Markow) signed various conditions of admission and that Markow relied on the Cedars website and the location of Howard Rosner's (Rosner) office in a Cedars building to conclude that the disclaimer in the conditions of admission did not apply to Rosner, the

reasonableness of Markow's belief in an agency relationship between Rosner and Cedars was hotly contested. Indeed, that very issue loomed as one of the core factual disputes that the jury had to resolve. Moreover, the trial court asked the jury to resolve the reasonableness of Markow's belief, not on an objective "reasonable person" standard, but on a subjective standard—that is, the jury had to determine whether, given Markow's own knowledge and experience, his belief was reasonable.[1]

Here, as discussed more below, the jury, by an 11-1 vote, found that Markow's belief about Rosner being Cedars's agent was neither irrational nor unreasonable—but in fact, reasonable. Consequently, the majority's claim that "all of the facts essential to the issue of ostensible agency were undisputed" (maj. opn. *ante*, at p. 18) appears to be more an artifice to circumvent the required deference to the trier of fact than a realistic assessment of the facts of this case. Moreover, the majority's reasoning is tautological. The only way that the majority can conclude that the issue of ostensible agency is a question of law subject to de novo review is to prejudge the evidence and determine that it conclusively indicates that the patient should have known that the treating physician was not the hospital's agent. In other words, the majority has assumed what it wants to prove.

*Mejia*, *supra*, 99 Cal.App.4th 1448, on which the majority relies (maj. opn. *ante*, p. 18), does not hold that the reasonableness of a patient's belief about an alleged ostensible agency relationship is always determined as a question of law. *Mejia* simply held that "[u]nless the evidence *conclusively* indicates that the patient should have known

---

[1] While the jury was asked to determine some issues, such as informed consent, on an objective reasonable person basis—for example, the jury was asked to determine whether a "reasonable person in . . . Markow's position [would] have refused the pain management procedure"–on the issue of ostensible agency the jury was asked whether Markow, not some objective, reasonable person, reasonably believed that Rosner was Cedars's agent.

2

that the treating physician was not the hospital's agent, . . . , the issue of ostensible agency must be left to the trier of fact."**2** (*Id.* at p. 1458.)

In short, facts are "'undisputed'" for purposes of de novo review if they are "'settled'" or "'not open to dispute or question.'" (*Adoption of Arthur M.* (2007) 149 Cal.App.4th 704, 717.) Here, a critical fact for resolution of the ostensible agency issue—the reasonableness of Markow's belief in an agency relationship between Rosner and Cedars—was not settled, but disputed, questioned and resolved by the trier of fact in Markow's favor. Because Cedars's appeal concerns a disputed issue of fact, it does not raise a pure question of law that would allow the majority to disregard the jury's factual findings and determine the issue independently. Instead, the ostensible agency issue must be reviewed under a different standard.

b. *Substantial evidence is the correct standard*

Cedars appeals from the denial of its motion for judgment notwithstanding the verdict (JNOV). "[W]hen reviewing a ruling on a motion for JNOV, 'an appellate court will use the same standard the trial court uses in ruling on the motion, by determining whether it appears from the record, *viewed most favorably to the party securing the verdict*, that *any* substantial evidence supports the verdict.'" "'""If there is *any* substantial evidence, or reasonable inferences to be drawn therefrom in support of the verdict, the motion should be denied."'"" (*Pacific Corporate Group Holdings, LLC v. Keck* (2014) 232 Cal.App.4th 294, 309, italics added.)

---

**2** The holding in *Mejia*, *supra*, 99 Cal.App.4th 1448, is consistent with other types of legal disputes where the reasonableness of a plaintiff's belief is at issue. For example, "'the question of whether a [fraud] plaintiff's reliance is reasonable is a question of fact.'" (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1239.) "The reasonableness of the plaintiff's reliance is judged by reference to the plaintiff's knowledge and experience." (*OCM Principal Opportunities Fund, LP v. CIBC World Markets Corp.* (2007) 157 Cal.App.4th 835, 864.) "Generally, '[a] plaintiff will be denied recovery only if his conduct is manifestly unreasonable in the light of his own intelligence or information.'" (*Id.* at p. 865.) The issue of reasonable reliance is a question of law only in the "rare case where the undisputed facts leave no room for a reasonable difference of opinion.'" (*Alliance Mortgage*, at p. 1239.)

Under the substantial evidence standard, our appellate review begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the jury's factual determinations. (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873–874; *Piedra v. Dugan* (2004) 123 Cal.App.4th 1483, 1489.) "'Even in cases where the evidence is undisputed or uncontradicted, if two or more different inferences can reasonably be drawn from the evidence *this court is without power to substitute its own inferences or deductions for those of the trier of fact . . . .*'" (*Jonkey v. Carignan Construction Co.* (2006) 139 Cal.App.4th 20, 24, italics added.) "The term 'substantial evidence' means such relevant evidence as a reasonable mind would accept as adequate to support a conclusion; it is evidence which is reasonable in nature, credible, and of solid value." (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1433.)

2.      *THE MAJORITY IGNORES THE FACT THAT NOTICE IS INHERENTLY A FACT ISSUE*

Although the majority correctly observes that the issue of ostensible agency, at its most elemental level, is an issue about notice (maj. opn. *ante*, pp. 9–10), they fail to acknowledge that whether notice is sufficient to inform a party about a fact is not a question of law for this court to decide, but a question of fact for the jury to decide. As our Supreme Court noted long ago, "whether notice was given or not, and if given, whether defendant understood it, and it was sufficient to put him on his guard, or, in the language of the code, to put a prudent man upon inquiry [citation], [are] questions of fact for the jury . . . ." (*Renton, Holmes, & Co. v. Monnier* (1888) 77 Cal. 449, 456.)

3.      *THE MAJORITY IGNORES THE DECISIVE NATURE OF THE JURY'S OSTENSIBLE AGENCY FINDINGS*

While the majority acknowledges that the jury ruled in favor of Markow and his wife, Francine Markow (collectively the Markows) on the issue of ostensible agency, they fail to note just how lopsided the votes were against Cedars. This lopsidedness is noteworthy because it demonstrates the jury's own view that substantial evidence supported its findings. On the issue of ostensible agency, the jury found as follows: (a) Cedars intentionally or carelessly created the impression that Rosner was its agent

4

(12-0); Markow reasonably believed that Rosner was the hospital's agent (11-1); and (c) Markow was harmed as a result of his belief that Rosner was the hospital's agent (10-2). Unfortunately, the majority has decided that they, not the jury, are better situated to evaluate the credibility of the Markows on such issues as (a) the Markows' reasons for choosing Rosner and Cedars in 2006 and continuing with Rosner and Cedars up to and beyond the surgery in 2010 and (b) the Markows' understanding and interpretation of the conditions of admissions as it applied to Rosner and his relationship with Cedars.

By choosing to ignore these touchstone principles and facts, the majority has become a second and self-appointed trier of fact—a role which appellate judges should shun. For example, the majority states that "any inference of agency or employment arising from Rosner's status as director of the pain clinic was negated by the unambiguous and prominent disclaimer Markow repeatedly initialed." (Maj. opn. *ante*, at p. 16.) This statement begs the question of who decided that the disclosure "negated" Rosner's status. Not the jury. They sat and listened to all of the evidence and decided in a decisive manner that the disclosures did not negate Rosner's status. Instead of focusing on facts that support the verdict and then determining whether they are "substantial," the majority highlights facts supporting the verdict that Cedars sought but the jury decisively rejected.

> 4. *THE MAJORITY ANALYZES THE* CONDITIONS OF ADMISSION *FORM IN ISOLATION, NOT IN CONTEXT*

The majority, quite properly, looks at the language of the various conditions of admission forms regarding the independent contractor status of physicians. (Maj. opn. *ante*, pp. 10–12.) But that is both the beginning and the end of the majority's analysis. The majority decision does not consider what the forms do *not* say, and, perhaps more critically, what was the trial testimony about these forms.

> a. *The majority ignores what the forms fail to address*

The majority ignores the fact that none of the conditions of admissions says anything about dual status physicians—that is, physicians who not only practice at Cedars, but also run administrative units of the hospital, such as the pain management

5

clinic.  Importantly, California courts have held that the director of a hospital's administrative unit "may be an agent of the hospital." (*Jacoves v. United Merchandising Corp.* (1992) 9 Cal.App.4th 88, 104 (*Jacoves*).)  In *Jacoves*, the parents of a young man who had committed suicide sued the hospital; the decedent had received treatment at the hospital from  a staff psychiatrist, who was also the director of the hospital's adolescent psychiatric unit. (*Id*. at pp. 99–100.)  The hospital won summary judgment based on evidence that the psychiatrist billed for his services separately from the hospital and had no office at the hospital. (*Id*. at p. 100.)  The Court of Appeal reversed, holding that such facts were not dispositive on the issue of ostensible agency:  "*reasonable inferences may be drawn from the fact that the Hospital designated [the physician] as director of its adolescent psychiatric unit . . . .*  It is also *reasonable to infer that the Jacoveses based their decision to admit Jonathan to the Hospital at least in part on [the physician]'s position with the Hospital.*" (*Id*. at p. 104, italics added.)

Here, the jury, after hearing all of the evidence, not only found that Markow reasonably believed that Rosner was Cedar's agent but it did so, not by a narrowly divided vote, but by a nearly unanimous vote of 11-1.

In addition, courts applying California law have held that, where a conditions of admission form, such as the ones at issue in this case, is arguably ambiguous over who is and is not an independent contractor, the issue of ostensible agency cannot be determined as a matter of law. (*Romar v. Fresno Cmty. Hosp. & Med. Ctr.* (E.D.Cal. Mar. 21, 2007, CIV F 03-6668 AWI SMS) 2007 U.S.Dist. Lexis 25927, 6, 44 (*Romar*).)  In *Romar*, when her minor daughter fell ill due to a bacterial infection, the minor's mother sought repeated treatment at a hospital's emergency room.  On each occasion, the mother signed conditions of admission forms that, inter alia, provided that "[a]ll physicians and surgeons . . . are independent contractors with the patient and are not employees or agents of the hospital." (*Id*. at p. *6.)  After the minor suffered permanent injury due to the inability of the hospital's medical staff to stem the spread of the infection, the minor, through her mother, sued for malpractice.  The court granted the treating doctor summary judgment because there was insufficient evidence that he had breached the standard of

6

care. (*Id*. at p. *47.) With regard to the physician assistants and nurse practioners who treated the minor, the hospital, relying on the conditions of admission form, moved for summary judgment. The court denied the hospital's motion, reasoning that "there is an ambiguity whether the Conditions Form reasonably informs patients that nurse practitioners and physician assistants are not employees or agents of [the hospital]. Given the language of the notice in the Conditions Form, the Court cannot say as a matter of law that [plaintiffs] knew or should have known that the nurse practitioners and physician assistants were not agents or employees of [the hospital]." (*Id*. at p. *16.)

As established by *Jacoves*, *supra*, 9 Cal.App.4th 88, and *Romar*, *supra*, 2007 U.S.Dist. Lexis 25927, Cedars created an issue of fact when it drafted its conditions of admission forms. By failing to address whether directors of its administrative units are also independent contractors, Cedars allowed this ambiguity to remain in its forms and, in fact, benefited from this ambiguity by permitting the impression that Rosner was one of Cedars's own doctors. In other words, by its conduct and omissions, Cedars, created an issue of fact for the jury to resolve. This ambiguity is not overcome by the fact that the conditions of admission forms indicated that General Anesthesiology Specialists (GASP), Rosner's actual employer, was one of the subgroups that were independent contractors. There was no testimony at trial by Rosner, the Markows or anyone else that the Markows knew at any time between 2006 and 2010 that Rosner was employed by GASP *and only GASP*. In other words, the GASP disclosure on the conditions of admission form is of no value to the ostensible agency determination in the absence of evidence that the Markows knew about GASP and that Rosner was employed by GASP *and only GASP*. Indeed, the testimony at trial was to the contrary—that is, both the Markows and others, including longtime Cedars's employees, testified that they believed that Rosner was an employee or agent of Cedars. After listening to this testimony and all of the other evidence presented at trial, the jury found, by an 11-1 vote, that Markow's belief about Rosner being an agent of Cedars was reasonable.

*b.* *The majority inexplicably disregards trial testimony about the conditions of admission forms*

The majority ignores the testimony at trial about the conditions of admissions. Tellingly, Cedars offered no testimony about its own forms. The *only* testimony at trial about these forms came from Markow. With regard to the independent contractor disclosure, Markow believed that it did not apply to Rosner because "he was director of pain management for the hospital" and, as a result, he "can't be an independent contractor." In other words, Markow thought that because Rosner had an office at Cedars and oversaw a department at Cedars, he was a "full-time employee" of the hospital. Other testimony at trial corroborated the reasonableness of Markow's interpretation of the forms. At trial, Vera Dae Borce, who had worked at Cedar's pain center for approximately 14 years, testified that she herself believed that Rosner worked for Cedars and she had never heard of Rosner's actual employer, GASP. From the jury's nearly unanimous vote on the issue of the reasonableness of Markow's interpretation, we know that the jury found such testimony to be not just credible, but compelling.

Two other sets of undisputed facts undeniably bolstered Markow's credibility on the issue of Rosner's ostensible agency. First, Rosner held himself out to the public as being affiliated with Cedars, not GASP. For example, although Rosner had been issued with GASP business cards, he did not use those cards; instead, he gave his patients business cards with Cedars's name on them. Second, Cedars itself held out Rosner as one of its doctors, not a GASP physician. For example, the Cedars's website identified Rosner as the medical director of Cedars's pain center with no mention of or reference to GASP. On Rosner's business cards from the Hospital, there is no mention of GASP. Moreover, if a patient or potential patient wanted to make an appointment with Rosner, he or she would not call GASP; instead, he or she would dial "1-800-CEDARS-1." In addition, when Rosner sent correspondence to other doctors, he would put the letter on

8

stationery with Cedars's letterhead—a privilege that Cedars granted to him.[3] Finally, there were no signs in Rosner's office at Cedars that mentioned or referenced the fact that he worked for GASP. It is clear that the jurors regarded such evidence as credible and persuasive, for they found by a unanimous 12-0 vote that Cedars intentionally or carelessly created the impression that Rosner was its agent. It is of no moment that the Markows may not have noted all of these factors; the importance of this evidence is Cedars's creation of an apparent agency relationship with Rosner.

---

[3] The majority, in part, bases its conclusion that Cedars was entitled to judgment as a matter of law on the fact that Markow did not testify that he relied on Rosner's business cards and stationery supplied by Cedars. (Maj. opn. *ante*, at p. 14, fn. 6.) The majority misses the point in three ways.

First, the business cards and stationery that Cedars provided to Rosner, and which Rosner used, go to the threshold issue of whether Cedars held Rosner out to the world, including the Markows, as one of its agents—in other words, this evidence goes to Cedars's conduct, not the reasonableness of Markow's beliefs. That the jury found by a unanimous vote that Cedars intentionally or carelessly created the impression that Rosner was its agent suggests that the jury regarded the business cards and stationery as probative on the issue of Cedars's conduct.

Second, whether Markow saw the business cards or the stationery is irrelevant, because he did see and he did rely upon Cedars's website, which described Rosner as the director of its pain management clinic and which said nothing whatsoever about Rosner's employment by GASP and GASP alone, and he did rely on the fact that Rosner was officed in a building plainly and prominently marked as a Cedars building. By finding (11-1) that Markow reasonably believed Rosner was Cedars's agent, the jury implicitly but necessarily and decisively found that Markow's reliance on the website's disclosures and the location of Rosner's office was sufficient for ostensible agency purposes—that is, Markow did not need to testify that he saw or relied upon the Cedars-supplied business cards or stationery.

Third, by focusing on the fact that Markow did not see or rely on the Cedars-supplied business cards and stationery, the majority is doing precisely what it should not do: combing the record for evidence that does not support the verdict. As discussed above, what the majority should be doing instead is reviewing the record in a way that is "'*most* favorabl[e]'" to the Markows and then determining whether "'''''*any* substantial evidence, or reasonable inferences to be drawn therefrom'''''" supports the jury's factual determination that Rosner was the ostensible agent of Cedars. (*Pacific Corporate Group Holdings, LLC v. Keck*, *supra*, 232 Cal.App.4th at p. 309, italics added.)

*Van Horn v. Hornbeak* (E.D.Cal. Feb. 17, 2010, CV F 08-1622 LJO DLB) 2010 U.S.Dist. Lexis 14321, illustrates how written disclosures, such as the conditions of admission, do not establish notice conclusively or as a matter of law.  In that case, the plaintiff, a state prisoner, received obstetrical treatment from a community hospital.  Each time she sought services at the hospital, the plaintiff "signed documents 'Conditions of Admissions' and 'Authorization and Consent' which gave notice that the physicians were not employees of [the hospital]." (*Id*. at p. *28.)  After her baby died one day after a cesarean section birth, plaintiff sued the hospital and two doctors for negligence in connection with the pre-natal care that they had provided her.  The hospital moved for summary judgment on the ground that its disclosures "foreclosed" the issue of ostensible agency as a matter of law, because those forms stated that the physicians were not the hospital's agents, but rather independent contractors.  The *Van Horn* plaintiff declared that she had "no reason to believe that [the physicians] were not hospital employees, that she believed they were, 'and was never told otherwise.'" (*Id*. at p. *31.)  The *Van Horn* court denied the hospital's motion for summary judgment, stating that "[i]n the face of these affirmations, the presence of the Conditions of Admission does not establish 'conclusively' that plaintiff should have known there was no agency." (*Ibid*.)  The court explained that, "under California's lenient standard of ostensible authority, plaintiff made a sufficient showing on the question of ostensible agency to avoid summary judgment." (*Ibid*.)

Here, the Markows' statements of belief regarding Rosner's status as an agent of Cedars are credible, with arguably more basis than the ones at issue in *Van Horn v. Hornbeak*, *supra*, 2010 U.S.Dist. Lexis 14321.  The Markows' belief was rooted in tangible indicators of Rosner's status as an agent of Cedars, such as the location of his office in a Cedars building, and the description of Rosner on the Cedars website as the medical director of its pain center with no mention whatsoever of Rosner's actual employer, GASP.  As noted above, the Markows' belief was shared by longtime Cedars's employees.

10

The majority, relying on language in *Mejia, supra,* 99 Cal.App.4th 1448, concludes that the ostensible agency doctrine is inapplicable to the Markows because once Rosner began treating Markow he became one of Markow's personal physicians. (Maj. opn. *ante*, at p. 13.)  Such a contention lacks merit because it is a plausible, but unproven, construct only—that is, it is not rooted in any evidence, just logical inferences. The majority, in other words, ignores the undisputed testimony at trial and instead attempts to generate its own evidence to support its disregard for the jury's factual findings.  For example, the majority stresses that "Cedars did not *assign* Rosner to treat Markow; Markow chose Rosner."  (Maj. opn. *ante*, at p. 13, italics omitted.)  While that is partially true (although Cedars did not assign Markow to Rosner, it recruited Rosner from across the country and made him the director of its pain management program, and in so doing effectively assigned all pain management patients to Rosner), it is only half the story.  Markow testified he and his wife chose Rosner, not because of who Rosner was independent of Cedars, but precisely because Rosner was affiliated with Cedars. Specifically, Markow testified that he elected to become one of Rosner's patients, even though Rosner's office was 30 to 40 miles away (or an hour to an hour and a half drive one way) from his home, because Rosner was the medical director of a pain center at Cedars, a major medical center that was also a teaching hospital; in other words, Markow went to Rosner because he "worked for the best hospital, one of the best hospitals in the country."  Moreover, there is no testimony—either explicit or implicit—that Markow would have agreed to be seen by Rosner in 2006 if he had not been at Cedars.  Nor is there any testimony that Markow would have continued to be seen by Rosner after 2006 if Rosner had left Cedars for another hospital.[4]

---

[4] The majority also places great stock in the fact that the Markows paid GASP bills.  (Maj. opn. *ante*, at p. 13 & fn. 4.)  However, there is no testimony by the Markows that when they were paying those bills they knew that Rosner was employed by GASP and GASP alone—that is, that they knew Rosner was not also employed by Cedars. Cedars could have asked such questions at trial but apparently elected not to do so.

11

The value that the Markows put on Cedars is also captured by Francine Markow's testimony. She was in favor of her husband being treated by Rosner because Rosner was at Cedars, a place where they would get the "best possible care, the best possible staff, the best possible doctors, equipment, etc.; we always felt that way." As she explained to the jury, using Cedars was important to her husband because "he always wanted to see someone who was affiliated with a major medical hospital, preferably even a teaching hospital because we have been told years ago that those are the best." Francine Markow's faith in Cedars proved almost unshakeable—even as her husband was developing the paralysis that would lead to his quadriplegia, she did not, despite the obvious medical emergency and the possibility of a 90-minute drive, consider going to another, closer hospital.

### 5. *THE MAJORITY'S POSITION IS BEREFT OF LEGAL SUPPORT*

The majority concludes that "the jury's ostensible agency finding is contrary to law." (Maj. opn. *ante*, at p. 17.) The majority's conclusion, however, is unsupported by any case law. The majority does not rely upon a single case decided in a nonemergency setting which holds that boilerplate conditions of admission forms "conclusively" establish as a matter of law that an ostensible agency relationship does not exist between a hospital and one of its doctors, let alone when the doctor at issue is also the director of a large and nationally prominent administrative unit at that same hospital. In fact, the two California cases upon which the majority most directly relies—*Mejia*, *supra*, 99 Cal.App.4th 1448; and *Whitlow v. Rideout Memorial Hospital* (2015) 237 Cal.App.4th 631— were both decided in the context of plaintiff-patients signing disclaimer forms in emergency room settings and both ruled in favor of the plaintiff-patient, not the hospital, on the issue of ostensible agency.

Although *Mejia*, *supra*, 99 Cal.App.4th 1448 was decided under different facts than those at issue here, the court explained in significant detail its thought process to insure that California law on the issue of ostensible agency "should be interpreted consistent[] with the national trend." (*Id.* at p. 1457.) As *Mejia* explained, the national trend is squarely in favor of factual findings in favor of an ostensible agency relationship:

12

"'The conception that the hospital does not undertake to treat the patient, does not undertake to act through its doctors and nurses, but undertakes instead simply to procure them to act upon their own responsibility, no longer reflects the fact. Present-day hospitals, as their manner of operation plainly demonstrates, do far more than furnish facilities for treatment. They regularly employ on a salary basis a large staff of physicians, nurses and internes [sic], as well as administrative and manual workers, and they charge patients for medical care and treatment, collecting for such services, if necessary, by legal action. Certainly, the person who avails himself of "hospital facilities" expects that the hospital will attempt to cure him, not that its nurses or other employees will act on their own responsibility.'" (*Id*. at p. 1453.) In view of this modern reality, the *Mejia* court observed that "the overwhelming majority of jurisdictions employ[] ostensible or apparent agency to impose liability on hospitals for the negligence of independent contractor physicians." (*Ibid*.)

Given the absence of any supporting authority, and given that the cases upon which it does rely are contrary to its position, it is the majority who finds itself in a position that is contrary to the law.

### 6. CONCLUSION

In sum, our role as a reviewing court in this instance is quite limited. We are to determine merely if the jury's ostensible agency findings were supported by substantial evidence. Our job is not to ignore or supplant the jury and decide the case as we believe it should have been decided. Yet that is exactly what the majority has done.

To establish ostensible agency liability against Cedars for the alleged malpractice of Rosner, the Markows needed to establish just two things: "(1) conduct by the hospital that would cause a reasonable person to believe there was an agency relationship and (2) reliance on that apparent agency relationship by the plaintiff." (*Mejia*, *supra*, 99 Cal.App.4th at pp. 1456–1457.)

After hearing 12 days of evidence and argument, and after deliberating over the course of four additional days, the jury found, and decisively so, that there was conduct by Cedars (either intentional or negligent) that created the impression that Rosner was its

13

agent (12-0) and that Markow reasonably relied on that apparent agency relationship between Rosner and Cedars (11-1). Evidence, in the principal form of uncontroverted trial testimony by the Markows, Rosner, and others, supported the jury's unanimous and near-unanimous findings. Instead of looking to that evidence to see if it was truly substantial (as it is required to do by the applicable standard of review), the majority simply ignores it. Instead, the majority has reweighed the evidence, and has supplanted the jury's decision about what was credible and what was not, what was important and what was not, and what was clear and what was ambiguous, with its own findings. That decision contradicts the applicable law as well as facts established at trial.

Because a patient is "generally presumed to have looked to the *hospital* for care," and because "ostensible agency *is readily inferred*" (*Mejia*, *supra*, 99 Cal.App.4th at pp. 1454–1455, italics added), a hospital's written disclaimer of agency, such as Cedars's conditions of admission, simply negates the inference of agency and compels the plaintiff-patient to present facts establishing that he or she had reason not to understand the disclaimer and/or appreciate its significance and/or that the hospital, by other actions or inactions, gave the patient grounds to believe reasonably that the physician was an agent of the hospital. "[T]he mere existence of a boilerplate admissions form is *not* sufficient to 'conclusively indicate[] that [the patient] should have known that the treating physician was not the hospital's agent. . . .'" (*Whitlow v. Rideout Memorial Hospital*, *supra*, 237 Cal.App.4th at p. 640, italics added.) In other words, the existence of a written disclaimer, such as Cedars's conditions of admission, does not end the factual inquiry into ostensible agency; it begins it.

Here, the Markows did what they needed to do—they presented evidence that Cedars held Rosner out as its agent and that they reasonably believed Rosner was Cedars's agent—and the jury found that evidence compellingly persuasive. Because substantial evidence supported the jury's factual determinations on the issue of ostensible agency, the trial court properly denied Cedars's motions for judgment notwithstanding the verdict and for a new trial.

14

I, therefore, respectfully dissent with regard to the ostensible agency issue. In all other respects, I would affirm the judgment.

JOHNSON, J.