Filed 5/8/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| DAVE PEBLEY,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>SANTA CLARA ORGANICS,<br>LLC, et al.,<br><br>  Defendants and Appellants. | 2d Civ. No. B277893<br>(Super. Ct. No. 56-2013-<br>00436036-CU-PA-VTA)<br>(Ventura County) |

An injured plaintiff with health insurance may not recover economic damages that exceed the amount paid by the insurer for the medical services provided. (*Howell v. Hamilton Meats & Provisions, Inc.* (2011) 52 Cal.4th 541, 566 (*Howell*).) The amount of the "full bill" for past medical services is not relevant to prove past or future medical expenses and/or noneconomic damages. (*Id.* at p. 567; *Corenbaum v. Lampkin* (2013) 215 Cal.App.4th 1308, 1330-1331 (*Corenbaum*).) In contrast, the amount or measure of economic damages for an uninsured plaintiff typically

turns on the reasonable value of the services rendered or expected to be rendered. (*Bermudez v. Ciolek* (2015) 237 Cal.App.4th 1311, 1330-1331 (*Bermudez*).) Thus, an uninsured plaintiff may introduce evidence of the amounts billed for medical services to prove the services' reasonable value. (*Id.* at pp. 1330-1331, 1335.)

Here, we are confronted with an insured plaintiff who has chosen to treat with doctors and medical facility providers outside his insurance plan. We hold that such a plaintiff shall be considered uninsured, as opposed to insured, for the purpose of determining economic damages.

Plaintiff Dave Pebley was injured in a motor vehicle accident caused by defendant Jose Pulido Estrada, an employee of defendant Santa Clara Organics, LLC (Santa Clara). Although Pebley has health insurance, he elected to obtain medical services outside his insurance plan. A jury found defendants liable for Pebley's injuries and awarded him $3,644,000 in damages, including $269,000 for past medical expenses and $375,000 for future medical expenses. For the most part, Pebley recovered the amounts that were billed for past services and expected to be incurred for future services.

We conclude the trial court properly allowed Pebley, as a plaintiff who is treating outside his insurance plan, to introduce evidence of his medical bills. Pebley's medical experts confirmed these bills represent the reasonable and customary costs for the services in the Southern California community. Pebley testified he is liable for these costs regardless of this litigation, and his treating surgeons stated they expect to be paid in full. The court permitted defendants to present expert testimony that the reasonable and customary value of the services provided by the

2

various medical facilities is substantially less than the amounts actually billed, and defendants' medical expert opined that 95% of private pay patients would pay approximately 50% of the treating professionals' bills.  The jury rejected this expert evidence and awarded Pebley the billed amounts.

Based on this record, defendants have not demonstrated error except with respect to two charges.  It is undisputed the jury improperly awarded Pebley the amounts billed by Ventura County Medical Center (VCMC) and American Medical Response (AMR) instead of the amounts paid to these providers by his insurance carrier.  The difference between the amounts billed and the amounts paid is $1,063.  We therefore reduce the damage award by that amount and affirm the judgment as modified.

FACTS AND PROCEDURAL BACKGROUND

*A.  The Accident*

On May 9, 2011, Pebley and his wife, Joline, were returning from a camping trip in their motor home.  Mrs. Pebley was driving eastbound on the 126 freeway in Ventura County when the vehicle developed a flat tire.  She turned on the hazard lights, pulled over to the right shoulder and stopped.  A portion of the motor home remained in the No. 2 lane.

In the rearview mirror, Mrs. Pebley saw a Kenworth "big rig" truck bearing down on them from behind.  The driver, Estrada, who was travelling at approximately 50 miles per hour, crashed into the left rear end of the motor home with sufficient force to break the passenger seat in which Pebley was seated.

The truck, which was owned by Santa Clara, was carrying a 40,000-pound load at the time of the collision.  Pebley was transported to the hospital by ambulance, treated and released.  He suffered injuries to his face, teeth, neck and lower back.

### B. Pebley's Medical Treatment

Pebley initially sought treatment through his health insurance carrier, Kaiser Permanente (Kaiser). After filing a personal injury action against defendants, Pebley obtained care from an orthopedic spine specialist, Dr. Gerald Alexander, who is outside the Kaiser network. Pebley testified he was referred to Dr. Alexander by members of his men's group. Defendants claim Pebley was referred to the doctor by his attorneys. They point to an internet article co-written by one of Pebley's attorneys. The article notes that "[t]ypically, medical liens in personal injury cases have been used where the plaintiff is uninsured, or where the insurance provider will not cover or refuses to authorize recommended medical care." The authors propose, however, that insured plaintiffs use the lien form of medical treatment, which "effectively allows the plaintiff and his or her attorney to sidestep the insurance company and the impact of *Howell*, *Corenbaum* and Obamacare." They maintain that treating on a lien basis increases the "settlement value" of personal injury cases. Pebley's post-Kaiser medical treatment was provided on that basis.

Dr. Alexander performed a 3-level cervical fusion surgery on March 13, 2014.[1] His co-surgeon was Dr. Carl Lauryssen. At trial, both doctors testified that the injuries Pebley suffered in the accident necessitated the surgery. Dr. Alexander also testified that Pebley would require additional cervical fusion surgery as well as lumbar fusion surgery. Dr. Alexander explained that a person undergoing spinal fusion surgery is "never normal again," and that Pebley could expect decreased

---

[1] Defendants claim Pebley became Medicare eligible in 2013, but Medicare was not billed for the surgery.

4

range of motion, ongoing weakness and numbness, and chronic pain for the rest of his life.

*C. Motions in Limine*

The parties filed numerous motions in limine addressing the admissibility of evidence concerning Pebley's medical treatment costs. Pebley's motion in limine No. 1 requested exclusion of evidence that Pebley was insured through Kaiser as well as defense arguments concerning Pebley's decision not to seek medical treatment through his insurance. Defendants conceded that Pebley was allowed to treat with doctors outside his insurance plan, but asserted the cost of available in-plan services was relevant to the measure of damages. Pebley claimed a due process right to make medical treatment decisions irrespective of insurance. The trial court granted Pebley's motion in limine.

Pebley's motion in limine No. 2 sought to exclude evidence of the amounts an insurance company may pay, or what a medical provider may accept, for medical services, both past and future. The motion was granted, along with motion in limine No. 5, which excluded evidence that Pebley obtained most of his medical treatment on a lien basis.[2]

Pebley's motion in limine No. 9 sought to preclude the defense's expert, Dr. Henry Miller, from challenging Pebley's evidence regarding the reasonable value of medical services. Pebley asserted that Dr. Miller's methodology for evaluating marketplace costs improperly includes the rates that providers

---

[2] The trial court denied defendants' corresponding motions in limine (Nos. 18 and 19) to admit evidence that Pebley sought medical treatment on a lien basis and was insured through Kaiser and Medicare.

accept from insurance companies and Medicare. The trial court conducted a hearing under Evidence Code section 402 to determine the admissibility of Dr. Miller's testimony.

Outside the jury's presence, Dr. Miller explained that part of his methodology in calculating the fair market value of a physician's professional fees is to determine what Medicare pays for that service and then to proportionately increase that rate to reflect pricing in the relevant community. Miller takes into account the Milliman Study, which was jointly funded by the American Hospital Association and insurance companies.

Pebley's surgery was performed at Olympia Medical Center (Olympia). Based on publicly available reports sent to the California Office of State Health Planning and Development, Dr. Miller determined the amount Olympia would accept as payment for its facility services, as distinct from what it would charge. Dr. Miller used the same information to determine the cash prices accepted by other medical facilities. Dr. Miller confirmed his calculation by telephoning Olympia and discovering that the cash price the hospital would accept for the surgical procedure performed on Pebley was $40,000, as opposed to the $86,599.85 billed for the procedure. Dr. Miller employed a different methodology to calculate the costs of professional services (i.e., physician fees rather than facility/hospital fees).

The trial court ruled that Dr. Miller could opine about the facility/hospital fees, but not the professional physician fees. It determined that Dr. Miller was "competent to testify as to everything except for the professional services fees" because his opinion on those fees required references to insurance. As a result, Dr. Miller testified at trial that the amount Olympia, Total Care Medical, Pacific Hospital of Long Beach, St. Jude

6

Medical Center, VCMC and Kaiser would accept for their services totaled $54,615.56, instead of the $120,876.55 requested by Pebley. Dr. Miller was not permitted to offer any opinions regarding the reasonable value of the treating physicians' care. The amount charged by Drs. Alexander and Lauryssen totaled $103,031.60.

Defendants' motion in limine No. 16 sought to exclude evidence of unpaid "bills" from health care providers pursuant to *Howell* and its progeny. This would have required Pebley to introduce independent evidence of market rate values for the care he received. The trial court denied the motion. It also denied defendants' motion in limine No. 20, which sought to prevent Dr. Alexander from offering opinions on the "reasonableness" of medical expenses based on unpaid billed amounts.

The trial court stated it was extending the ruling in *Bermudez*, which involved an uninsured plaintiff, to cover the facts of this case. As a result, the full lien amounts that were billed were admissible. The court acknowledged, however, that under *Howell*, "clearly, the notion is the full amount billed is not the appropriate amount, it's somewhere . . . below that." It explained: "So it really boils down to a . . . battle of the experts. Plaintiff[] can come in and say, here's [my] bill, it's $300,000 and an expert says, hey, 300 is right on. And the other side is going to come in and say, no, we can get all of these things for $100,000, and, but we can't have any talk at all about insurance, about how the $100,000 is justified."

*D. The Verdict and Motion for New Trial*

The jury unanimously found that defendants were negligent, and that neither Pebley nor his wife was negligent. It awarded Pebley past medical expenses of $269,000 (the full

7

amount requested by Pebley), future medical expenses of $375,000, past noneconomic damages of $900,000, and future noneconomic damages of $2,100,000.

Defendants moved for a new trial, arguing the damages were excessive and that the award of medical expenses could not stand under *Howell* and its progeny. The trial court summarily denied the motion. Defendants appeal.

DISCUSSION

A. *Standard of Review*

Whether a plaintiff ""'is entitled to a particular measure of damages is question of law subject to de novo review."'" (*Markow v. Rosner* (2016) 3 Cal.App.5th 1027, 1050.) The amount of damages, however, is a question of fact. The award will not be disturbed if it is supported by substantial evidence. (*Ibid.*)

The trial court's evidentiary rulings are reviewed for abuse of discretion. (*Moore v. Mercer* (2016) 4 Cal.App.5th 424, 444 (*Moore*).)

B. *Admissibility of Medical Providers' Bills to Prove Economic Damages*

"Before 1988 a plaintiff, relying on the collateral source rule, could recover the full amount of a health provider's charges despite the fact that an insurer or governmental agency had prenegotiated a discounted rate for the services and the plaintiff was not liable for the full amount. (*Helfend v. Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 1, 6.) The collateral source rule states that 'if an injured party receives some compensation for his injuries from a source wholly independent of the tortfeasor, such payment should not be deducted from the damages which the plaintiff would otherwise collect from the tortfeasor.'" (*Moore, supra*, 4 Cal.App.5th at p. 437.)

8

The 1988 change came when the Court of Appeal decided *Hanif v. Housing Authority* (1988) 200 Cal.App.3d 635 (*Hanif*). That case limited awards for medical damages in cases where the plaintiff has a benefit (in that case Medi-Cal) that has a prenegotiated arrangement with the medical services provider for reduced cost of the services.  (*Id.* at pp. 643-644.)  A similar rule was adopted for private medical insurance in *Howell*, *supra*, 52 Cal.4th at page 566.  Since *Hanif* and *Howell*, "the measure of medical damages is the lesser of (1) the amount paid or incurred, and (2) the reasonable value of the medical services provided." (*Bermudez*, *supra*, 237 Cal.App.4th at p. 1330; see *Howell*, *supra*, 52 Cal.4th at p. 555.)

Thus, "an injured plaintiff whose medical expenses are paid through private insurance may recover as economic damages no more than the amounts paid by the plaintiff or his or her insurer for the medical services received or still owing at the time of trial." (*Howell*, *supra*, 52 Cal.4th at p. 566.)  The court in *Howell* reasoned that because insured plaintiffs incur only the fee amount negotiated by their insurer, not the initial billed amount, insured plaintiffs may not recover more than their actual loss, i.e., the amount incurred and paid to settle their medical bills. (*Id.* at p. 555.)  The court explained, "It follows from our holding that when a medical care provider has, by agreement with the plaintiff's private health insurer, accepted as full payment for the plaintiff's care an amount less than the provider's full bill, evidence of that amount is relevant to prove the plaintiff's damages for past medical expenses and, assuming it satisfies other rules of evidence, is admissible at trial. . . .  Where the provider has, by prior agreement, accepted less than a billed amount as full payment, evidence of the full billed amount is not

9

itself relevant on the issue of past medical expenses." (*Id.* at p. 567.)

*Howell* recognized there is "an element of fortuity" involved with respect to the medical expenses a tortfeasor may be liable to pay. (*Howell, supra,* 52 Cal.4th at p. 566.) For example, "[a] tortfeasor who injures a member of a managed care organization may pay less in compensation for medical expenses than one who inflicts the same injury on an uninsured person treated at a hospital." (*Ibid.*)

Relying upon *Howell,* the Court of Appeal in *Corenbaum* concluded that in an action involving an insured plaintiff, evidence of the full amount billed for past medical services is irrelevant and thus inadmissible to prove past medical expenses, future medical expenses and/or noneconomic damages. (*Corenbaum, supra,* 215 Cal.App.4th at pp. 1328-1333.) In so ruling, the court distinguished *Katiuzhinsky v. Perry* (2007) 152 Cal.App.4th 1288, 1295-1296 (*Katiuzhinsky*), which determined that evidence of the full amount billed is admissible to assess the reasonable value of past medical services if the plaintiff is uninsured and "remained fully liable to [his or her] medical providers for the full amount billed . . . ." (*Corenbaum,* at p. 1328, fn. 10.)

Citing *Howell* and *Corenbaum,* the court in *Ochoa v. Dorado* (2014) 228 Cal.App.4th 120 (*Ochoa*), held that even where there is no prenegotiated discounted rate, "the full amount billed, but unpaid, for past medical services is not relevant to the reasonable value of services provided." (*Id.* at p. 135.) *Ochoa* acknowledged that *Howell* "did not expressly hold that unpaid medical bills are not evidence of the reasonable value of the services provided," but it interpreted *Howell* as "strongly

10

suggest[ing] such a conclusion." (*Ochoa*, at p. 135.) The court declined to follow *Katiuzhinsky*, finding it unpersuasive with respect to whether billed medical charges reflect the reasonable value of services provided. (*Ochoa*, at p. 138.) Rather, it concluded that "evidence of unpaid medical bills cannot support an award of damages for past medical expenses." (*Id.* at p. 139.)

The Court of Appeal in *Bermudez*, *supra*, 237 Cal.App.4th 1311, rejected *Ochoa's* reasoning in cases involving uninsured plaintiffs. It noted that *Howell* had clarified the law with respect to the recovery of medical damages where the injured person is insured, but that "[t]he ramifications of *Howell* . . . in a case brought by an uninsured plaintiff (who has not paid his bill) are less clear." (*Bermudez*, at p. 1329, italics omitted.) The court explained, "*Howell* certainly did not suggest uninsured plaintiffs are limited in their measure of recovery to the typical amount incurred by an insured plaintiff, or, for that matter, the typical amount incurred by any other category of plaintiff." (*Ibid.*) Nor did *Howell* offer any "bright-line rule on how to determine 'reasonable value' when uninsured plaintiffs have incurred (but not paid) medical bills"; it merely endorsed the use of a "market or exchange value," which *Bermudez* deemed consistent with *Katiuzhinsky*. (*Bermudez*, at p. 1330.) *Bermudez* concluded, "[T]he measure of damages for uninsured plaintiffs who have not paid their medical bills will usually turn on a wide-ranging inquiry into the reasonable value of medical services provided, because uninsured plaintiffs will typically incur standard, nondiscounted charges that will be challenged as unreasonable by defendants." (*Id.* at pp. 1330-1331; accord *Uspenskaya v. Meline* (2015) 241 Cal.App.4th 996, 1007.)

11

In sum, when a plaintiff is not insured, medical bills are relevant and admissible to prove both the amount incurred and the reasonable value of medical services provided. (*Bermudez, supra,* 237 Cal.App.4th at p. 1335, 1337; *Katiuzhinsky, supra,* 152 Cal.App.4th at pp. 1295-1296 [bills for charges incurred by the plaintiff were admissible "as they reflected on the nature and extent of plaintiffs' injuries and were therefore relevant to [the jury's] assessment of an overall general damage award"].) But the uninsured plaintiff also must present additional evidence, generally in the form of expert opinion testimony, to establish that the amount billed is a reasonable value for the service rendered. (*Bermudez,* at pp. 1336, 1338.) Thus, if the plaintiff has an expert who can competently testify that the amount incurred and billed is the reasonable value of the service rendered, he or she should be permitted to introduce that testimony. The defendant may then test the expert's opinion through cross-examination and present his or her own expert opinion testimony that the reasonable value of the service is lower. A jury could, based on this "wide-ranging inquiry," best decide the reasonable value of the medical treatment, which is likely to be the cap on the uninsured plaintiff's medical damages. (*Id.* at pp. 1330-1331, 1338.)

### C. An Injured Plaintiff Who Elects Not to Use an Available Insurance Plan Will be Treated as "Uninsured"

The threshold issue before us is whether Pebley is to be classified as insured or uninsured under *Howell* and its progeny. Although Pebley admittedly has health insurance, he chose to receive medical services outside his insurance plan. As defendants concede, Pebley had a right to choose physicians and medical facilities outside his plan, but they maintain he also had

12

a duty to mitigate his damages. They assert he did not meet this duty when he elected to treat with lien providers.

Defendants cite no specific authority for this assertion. They reference general authority that every plaintiff has a duty to take reasonable steps to minimize the loss caused by a defendant's actions. (*Placer County Water Agency v. Hofman* (1985) 165 Cal.App.3d 890, 897.) For example, "[u]nder the avoidable consequences doctrine as recognized in California, a person injured by another's wrongful conduct will not be compensated for damages that the injured person could have avoided by reasonable effort or expenditure." (*State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1043; *Rosenfeld v. Abraham Joshua Heschel Day School, Inc.* (2014) 226 Cal.App.4th 886, 900 ["'[A] plaintiff's recoverable damages do not include those damages that the plaintiff could have avoided with reasonable effort and without undue risk, expense, or humiliation.'"].)

Defendants maintain Pebley failed to mitigate his medical expenses by opting for the most expensive method to pay for his treatment. They contend that Pebley's unreasonable choice of going outside his insurance plan for treatment resulted in excess medical expenses which constitute avoidable losses Pebley seeks to pass on to defendants.

Defendants do not dispute, however, that Pebley is entitled to recover the lesser of (1) the amount incurred or paid for medical services, and (2) the reasonable value of the services rendered. (*Howell*, *supra*, 52 Cal.4th at pp. 555-556; *Bermudez*, *supra*, 237 Cal.App.4th at pp. 1330-1331, 1337.) The fact that Pebley chose to pay for those services out-of-pocket, rather than use his insurance, is irrelevant so long as these requirements are

13

met.  We therefore reject defendants' argument that Pebley failed to mitigate his damages.  A tortfeasor cannot force a plaintiff to use his or her insurance to obtain medical treatment for injuries caused by the tortfeasor.  That choice belongs to the plaintiff.  If the plaintiff elects to be treated through an insurance carrier, the plaintiff's recovery typically will be limited to the amounts paid by the carrier for the services provided.  (*Howell*, at p. 566.)  But where, as here, the plaintiff chooses to be treated outside the available insurance plan, the plaintiff is in the same position as an uninsured plaintiff and should be classified as such under the law.

There are many reasons why an injured plaintiff may elect to treat outside his or her insurance plan.  As Pebley points out, plaintiffs generally make their health insurance choices before they are injured.  These choices may be based on the plaintiffs' willingness to bear the risk posed by a health maintenance organization (HMO) rationing system because the plaintiff is healthy and requires little care.  This decision may appear much different after a serious accident, when the plaintiff suddenly needs complex, extensive care that an HMO is not structured to provide.  (See, e.g., *Pegram v. Herdrich* (2000) 530 U.S. 211, 220-221 [147 L.Ed.2d 164] ["inducement to ration care goes to the very point of any HMO scheme"].)  The plaintiff also may wish to choose a physician or surgeon who specializes in treating the specific type of injury involved, but who does not accept the plaintiff's insurance or any other type of insurance.  In addition, health care providers that bill through insurance, rather than on a lien basis, may be less willing to participate in the litigation process.

14

It is undisputed Pebley required complex surgery to fuse three of his cervical vertebrae. Complications from this type of surgery include paralysis or death. And even absent complications, a poor outcome would leave Pebley with continued pain in his neck and weakness and numbness in his arms and hands. Pebley had the right to seek the best care available and the incentive to do so.

Pebley testified he met with Dr. Alexander and was comfortable with the surgeon's credentials and experience. As a result, Pebley chose to have Dr. Alexander perform the cervical spine fusion surgery. Pebley confirmed he is personally liable for all of the costs of that surgery and his related treatment. Defendants cite no authority suggesting that Pebley's tort recovery should be limited to what Kaiser (and possibly Medicare) would have paid had he chosen to treat with providers who accept that insurance. The better view is that he is to be considered uninsured (or non-insured) for purposes of proving the amount of his damages for past and future medical expenses. (See *Bermudez*, *supra*, 237 Cal.App.4th at pp. 1336-1337.) It would be inequitable to classify Pebley as insured when Pebley, and not an insurance carrier, is responsible for the bills. Indeed, precluding Pebley from recovering the reasonable value of the services for which he is liable would result in both undercompensation for Pebley and a windfall for defendants. (*Katiuzhinsky*, *supra*, 152 Cal.App.4th at p. 1296.)

Finally, we conclude the trial court did not abuse its discretion by excluding evidence of Pebley's insured status under Evidence Code section 352. Pebley had the right to treat outside his plan. Evidence of his insurance would have confused the issues or misled and prejudiced the jury.

15

*D. The Parties Properly Engaged in a "Wide-Ranging Inquiry"*
*Regarding the Reasonable Value of Pebley's Medical Expenses*

Because Pebley elected to treat outside his insurance plan, the trial court did not err by allowing him to introduce evidence of the $269,498.65 in billed charges for his past medical services. (*Bermudez, supra*, 237 Cal.App.4th at p. 1335, 1337; *Katiuzhinsky, supra*, 152 Cal.App.4th at pp. 1295-1296.) But that evidence was insufficient, by itself, to establish the reasonable value of the services rendered. (*Bermudez, supra*, at pp. 1336, 1338.) Under *Bermudez*, Pebley was required to proffer expert testimony on the issue. (*Id.* at p. 1335.)

The two surgeons who performed Pebley's cervical fusion surgery, Drs. Alexander and Lauryssen, both offered their opinions concerning the reasonable value of Pebley's medical care. Dr. Alexander testified as a non-retained treating surgeon and also as a retained spine expert. Dr. Alexander, who is board certified, has performed approximately 1,000 cervical spinal fusion surgeries and between 2,000 and 3,000 lumbar surgeries.

Dr. Alexander was shown Exhibit No. 85, which set forth Pebley's billed medical costs for accident-related care through the date of trial. Dr. Alexander explained that "[i]n addition to being familiar with the costs of these types of surgeries for my own patients, I've reviewed hundreds of other cases and I'm very familiar with the standard costs for this type of treatment." This included familiarity with the costs of emergency room treatment, MRIs, CT scans, physical therapy and ambulance transport.

Dr. Alexander testified that all of the costs listed on Exhibit No. 85 are "reasonable and customary costs in the community." With respect to future medical care, Dr. Alexander stated Pebley would require a lumbar fusion surgery, as well as one or two

additional cervical fusion surgeries.  He testified that the lumbar surgery would cost "around $175,000," including the hospital charges.  As for the cervical fusion surgeries, he said the reasonable and customary cost for one level is $125,000.  If two levels are done, the cost is closer to $175,000.  He opined that the surgeries are reasonably certain to be necessary at some point in Pebley's lifetime.

On cross-examination, Dr. Alexander testified there is an expectation that a private pay party with a large bill will pay the bill.  Pebley has not paid his bill, but Dr. Alexander expects it will be paid.  He conceded he does not always get paid 100% of his bills, but stated he does not routinely discount them.

Dr. Lauryssen, the neurosurgeon who served as co-surgeon during Pebley's surgery, testified (via deposition) that he is a former director of spine research at Cedars-Sinai Medical Center and Olympia.  He has done close to 4,000 surgeries, about half of which involved the cervical spine.  Dr. Lauryssen testified that he lived and practiced in Los Angeles for ten years and is familiar with the costs for cervical and lumbar surgeries at hospitals in that area.  He stated the reasonable and customary all-inclusive cost for the cervical fusion surgery that Pebley underwent is about $150,000.  He explained this amount would also be a realistic estimate for the reasonable and customary cost of the future cervical fusion surgery that Pebley would require.

As defendants point out, both surgeons emphasized the reasonable cost of the medical services rather than their reasonable value, market value or exchange rate value.  The applicable jury instructions, however, refer to "cost" instead of any type of "value."  The trial court instructed the jury with CACI No. 3903A, which states:  "To recover damages for past medical

17

expenses, David Pebley must prove the *reasonable cost* of reasonably necessary medical care that he has received." (Italics added.) It further states: "To recover damages for future medical expenses, David Pebley must prove the *reasonable cost* of reasonably necessary medical care that he is reasonably certain to need in the future."[3] (Italics added.) Thus, as far as the jury was concerned, it was Pebley's burden to prove the "reasonable cost" of past and future medical expenses. The surgeons' testimony was consistent with CACI No. 3903A and, in the absence of an objection to the instruction, it was appropriate for them to testify regarding the reasonable cost of reasonably necessary medical care that Pebley has received and is expected to receive in the future.[4]

It is apparent from the record that both surgeons "were qualified to provide expert opinions concerning the reasonable value of the medical costs at issue. [Their] opinion testimony was based in part on the medical costs incurred by [Pebley] and in part on other factors considered by the experts, including their own experiences treating patients. This was not purely speculative evidence without any basis in the real world (like, for

---

[3] Defendants did not object to this instruction. Nor do they contend it was given in error.

[4] In contrast to CACI No. 3903A, BAJI No. 14.10 states that the measure of damages for personal injury expenses is "[t]he reasonable value of medical [hospital and nursing] care, services and supplies reasonably required and actually given in the treatment of the plaintiff to the present time [and the present cash value of the reasonable value of similar items reasonably certain to be required and given in the future]. [¶] [These are items of economic damage.]."

instance, speculative lost profits expert testimony in a business dispute). [Pebley] actually suffered severe injuries and underwent expensive medical treatment. The evidence presented was sufficient to support an award of . . . past [and future] medical damages." (*Bermudez*, *supra*, 237 Cal.App.4th at p. 1339; see *Moore, supra*, 4 Cal.App.5th at p. 434 [upholding jury's award where the medical experts "testified the amounts they billed reflected their ordinary and customary charges and the reasonable value of their services"].)

Moreover, the trial court allowed defendants to present their own expert evidence regarding the reasonable value of Pebley's past and future medical expenses. (See *Moore, supra*, 4 Cal.App.5th at p. 446 [noting "defendant had the opportunity to present evidence to rebut plaintiff's assertion that the reasonable value of the services was the full amount of the charges"].) Dr. Miller testified that the amount the medical facility providers would accept for their services totaled $54,615.56, instead of the $120,876.55 requested by Pebley. Although Dr. Miller was not permitted to testify as to the reasonable value of the professional fees, defendants' other expert, Dr. Richard Kahmann, a spinal surgeon, testified that 95% of patients who pay for his care out of pocket pay about 50% of what he charges.

During closing argument, defense counsel reminded the jury of Dr. Kahmann's testimony and requested that the jury "take the figures that are related to the neck surgery and attendant care and the future medical specials, and that you reduce that by 50 percent, and then go to Dr. Kahmann's column on reasonable cost. And as you take all of these items and apply Dr. Kahmann's testimony, his expert opinion on these issues in addition to Dr. Miller's expert opinion on these issues, the past

medical costs reasonably total . . . $78,214.63. When you perform the same analysis with respect to the future medical specials, the figure is $75,602.52 . . . . The total for the past and future medical specials is $153,817.15 [sic]." This sum is substantially less than the $644,000 awarded by the jury.

As contemplated in *Bermudez*, the trial court permitted a "wide-ranging inquiry into the reasonable value of medical services provided." (*Bermudez*, *supra*, 237 Cal.App.4th at p. 1331.) Each side presented two experts. The jury was instructed that "[if] the expert witnesses disagreed with one another, you should weigh each opinion against the others." The jury presumably followed this instruction and rejected the defense experts' testimony as less credible. (See *People v. Boyette* (2002) 29 Cal.4th 381, 436; *People v. Sanchez* (2001) 26 Cal.4th 834, 852.) The credibility of battling experts is within the jury's province. (*County of Monterey v. W. W. Leasing Unlimited* (1980) 109 Cal.App.3d 636, 646.)

Defendants contend they were unable to effectively engage in a "battle of the experts," because the trial court excluded Dr. Miller's testimony regarding the reasonable value of the medical professionals' fees. This contention would be more persuasive if Dr. Kahmann had not been allowed to opine on the same subject. The fact that Dr. Miller's proposed evidence was cumulative to Dr. Kahmann's testimony undercuts defendants' claim of prejudice. (See *South Bay Chevrolet v. General Motors Acceptance Corp.* (1999) 72 Cal.App.4th 861, 906.) This was not, as defendants assert, a situation in which the only measure of cost or value before the jury was the medical professionals' full bills. (See *Children's Hospital Central California v. Blue Cross of California* (2014) 226 Cal.App.4th 1260, 1279.)

*E.  The Damage Award Must be Reduced by $1,063*

The jury awarded Pebley the full amounts billed by VCMC and AMR ($14,816.50 and $1,608.19, respectively), even though Pebley's insurance carrier paid a lesser amount for the services ($13,828.50 and $1,533.19, respectively).  Pebley concedes these two awards violate *Howell* and that the judgment must be reduced by $1,063 -- the difference between the amounts billed and the amounts actually paid.  (See *Howell, supra,* 52 Cal.4th at p. 566.)

## DISPOSITION

The judgment is modified to reduce the award of damages by $1,063 to $3,642,937.  In all other respects, the judgment is affirmed.  Pebley shall recover his costs on appeal.

<u>CERTIFIED FOR PUBLICATION.</u>

PERREN, J.

We concur:

GILBERT, P. J.

TANGEMAN, J.

21

Rocky J. Baio, Judge

Superior Court County of Ventura

_____

Horvitz & Levy, Lisa Perrochet and Steven S. Fleischman; Benton, Orr, Duval & Buckingham, Kevin M. McCormick and Panda L. Kroll, for Defendants and Appellants.

The Simon Law Group, Sevy W. Fisher and Greyson M. Goody; The Ehrlich Law Firm and Jeffrey I. Ehrlich, for Plaintiff and Respondent.